Kent ACOSTA, et al,

v.

MASTER MAINTENANCE, et al.

Debra Adams, et al,

v.

Georgia Gulf Corporation, et al.

Nos. Civ. A. 98–1065–A–M2,
Civ. A. 98–1066–A–M2.

United States District Court,
M.D. Louisiana.

Dec. 18, 2001.

## REPORT & RECOMMENDATION

NOLAND, United States Magistrate Judge.

A hearing was held May 21, 2001 on the pending motion to fix the costs incurred by the Georgia Gulf Litigation Group ("GGLG"). The motion was filed by previous clients of the Georgia Gulf Litigation Group (the "objectors"), as they challenge the right of the GGLG to subtract 2.5% of their settlements for costs incurred by the GGLG for the common benefit of all plaintiffs and they challenge the amount of costs claimed.

The GGLG is comprised of five members of the Plaintiff's Steering Committee ("PSC") appointed by the 18th Judicial District Court of the Parish of Iberville, Louisiana. These consolidated Georgia Gulf cases involve the release of a large quantity of mustard gas at the Georgia Gulf Corporation plant (Georgia Gulf) in Plaquemine, Louisiana on September 25, 1996. They were removed to this Court on December 23, 1998.

While the cases were still in the state court, the district judge appointed the PSC by orders of the Court dated March 25, 1997 (PSC Exh. 21), and November 3, 1997 (PSC Exh. 22). The earlier order states as follows:

An award for the costs associated with work required of the plaintiffs' committee on behalf of all plaintiffs by virtue of this Order will be borne by all plaintiffs who benefit as a result of this effort. It is therefore required that all members of the committee shall keep a daily record of their time and expenses incurred in connection with their activities as committee members. The committee may not bill for time spent in pursuit of its own claims. Since one of the criteria used by the Court in establishing the Committee is the number of claimants the attorneys represent, and since those claimants will benefit from the result of work by their attorneys, the Court will assess a pro-rata type of expense to the additional plaintiffs.

PSC Exh. 21.

In the November 3, 1997 order, the Court appointed Mr. Robert H. Schmolke as Plaintiffs' Liaison Counsel and Mr. Lewis O. Unglesby as Plaintiff's Lead Counsel, giving each specific duties, not pertinent here. Messrs. Donald T. Carmouche, Joseph J. McKernan, Michael V. Clegg, Patrick C. Morrow and Frank Tomeny, III were additionally appointed to

the Plaintiffs' Steering Committee ("PSC"). In Section C. 2. of the order, the Court stated:

2. All plaintiffs' counsel and/or unrepresented plaintiffs shall make arrangements with Plaintiffs' Liaison Counsel to escrow funds for immediate reimbursement to Plaintiffs' Liaison Counsel of the costs incurred to serve documents as ordered herein above. Plaintiffs' Liaison Counsel shall maintain a separate and detailed expense log for each counsel/entity to whom notice is provided by Plaintiffs' Liaison Counsel reflecting all expenses incurred. The log shall reflect total copying costs, number of copies, copy charge per page, total postage costs, the number of items mailed, actual time expended by employees performing duties assigned herein above, and standard hourly rate charged for each employee's services. Each party has the right to object to any charges by filing an objection with Liaison Counsel within fifteen (15) days of request for payment. Thereafter, if no agreement is reached, either party may file a motion with the Court to resolve the issue.

PSC Exh. 22.

On April 14, 1998, the Plaintiffs' Steering Committee filed a Motion to Establish an Escrow Account to Compensate Plaintiffs' Steering Committee for Costs, Expenses and Attorneys' Fees. However, by July 16, 1998, the PSC and some of the non-PSC counsel had signed a letter agreeing to escrow 2.5% of any settlement "in consideration for the PSC's work ...," and that no further amounts for costs/fees will be sought by the PSC." This letter begins by referencing the PSC's "claim for attorney's fees/costs in the above referenced matter,...." When counsel reached this agreement, the state court acquiesced in the agreement and did not enter a rul-

ing on the motion. Since the state court accepted this agreement, no other procedures were instituted for costs reimbursement in accordance with the Court's prior rulings, thus relieving the attorneys from the responsibility of keeping costs records. Further, the attorneys believed that they would be getting all of the 2.5% in payment of their costs and additional attorney's fees for their work on the PSC.

By December of 1998, several settlements had been reached and the PSC decided to file a Motion for Cost Reimbursement. The PSC stated, in this motion, that five cases had settled and they wanted all non-PSC plaintiffs' attorneys and participating defense counsel to provide them with information on the settlements and escrow the 2.5% money. At the hearing on the motion,[1] the Court stated, in pertinent part: "... Court is going to order that any non-steering committee plaintiffs produce a copy of the draft together with any release, receipt and release. Those two things must be produced or else possibly be held in contempt of court for violating this order." *Id.*, p. 22. During that hearing, the Court also exempted Mr. Daniel Becnel's cases and the cases of Ms. Donna Grodner from this order, but he never specifically ordered anyone to escrow the 2.5% out of their settlements; the judge just ordered everyone to give the PSC information on their settlements so the PSC would be sure to get their 2.5% in accordance with the agreement. *Id.*, p. 27. This Court understands that a separate order was going to be submitted to the district judge for his approval, setting forth his ruling with more details, however, the case was removed the next day, December 23, 1998, and the separate order was never entered. Most importantly, the court never took control of any escrowed funds.

---

**1.** Excerpts from transcript December 22, 1998, *Andrew Johnson, et al v. Harmony Con-* *struction, Et Al.* No. 48,054, 18th JDC, Parish of Iberville, State of Louisiana.

After removal, settlements were being executed and motions to dismiss were being filed, but, to the undersigned's knowledge, no mention was made about the 2.5% agreement, the 2.5% escrowed money or Judge Best's ruling concerning the recovery of "costs." Since this Court had no knowledge of the escrowed funds, the Court proceeded as though no escrowed funds existed.

On February 9, 2000, a lawsuit was filed in the 19th Judicial District Court on behalf of several plaintiffs from this litigation against the Georgia Gulf Litigation Group attorneys.[2] This suit alleged malpractice and various breaches of the duties owed by the PSC to its clients, including questioning the propriety of the 2.5% withholding. Shortly thereafter, the GGLG filed a Petition for Declaratory Judgment in the 18th Judicial District Court, Parish of Iberville, State of Louisiana, asking the court to assess costs in the matter so that any appropriate refunds of the 2.5% money could be made. A hearing was set for April 12, 2000.

On April 10, 2000, Mr. Wendell G. Lindsay, Jr., Esq. and Mr. L. Stephen Rastanis, Esq. filed the Joint Motion to Fix Method of Determining Costs Sought to be Charged by Former Attorneys for Settling Plaintiffs, and For Stay of State Court Suit Brought by Former Attorneys on Such Issue on behalf of certain plaintiffs who had previously been represented by the GGLG. Hearing on the motion to stay was

held before the Honorable Judge John V. Parker on April 11, 2000. Judge Parker issued an order restraining named plaintiffs, the named defendants and their lawyers and all others acting with or for them from prosecuting the action in the 18th Judicial District Court, Parish of Iberville, La., until further order of the court, finding that this Court was the proper Court to handle such matters, and referred the motion to fix costs to the undersigned.

■ By Amended Ruling and Order dated June 7, 2001[3], this Court determined that the state court judge's authority for appointing the PSC and requiring all plaintiffs to share in the expenses of the PSC was through the "common fund" doctrine.[4] It also determined that the Court had a responsibility to the plaintiffs and the public to re-take control of the remaining money in the 2.5% fund and approve costs in this matter. See, *Purdy v. Security Savings & Loan Association, et al.,* 727 F.Supp. 1266, 1268 (E.D.Wis.1989). In Purdy, the Court reasoned:

When a common fund is available, attorneys for the successful parties may petition for a portion of the fund as compensation for their efforts. Once an attorney files such a petition, his role changes from one of fiduciary for his clients to that of a claimant against the fund created for the clients' benefit. Defendants, having made their contribution to the settlement, are uninterested in the distribution, so (as in this case) they typically do not offer any op-

---

2. The GGLG consisted of Messrs. Unglesby, Carmouche, Schmolke, McKernan and Clegg. It was later determined that Messrs. Frank Tomeny and James Ryan, who took Patrick Marrow's place on the PSC, did not participate in the 2.5% agreement and did not charge for additional costs and therefore were not part of this suit.

3. The original Ruling was issued April 13, 2001.

4. See, The *Boeing Company v. Van Gemert, et al.,* 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980); *Sprague v. Ticonic Nat. Bank et al.,* 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939); *Trustees v. Greenough,* 105 U.S. 527, 15 Otto 527, 26 L.Ed. 1157 (1881); *In re Air Crash Disaster at Florida Everglades on December 29, 1972,* 549 F.2d 1006 (5th Cir. 1977); *In re Interstate Trust & Banking Company,* 235 La. 825, 106 So.2d 276 (1958).

position to the fee petition. It is, therefore, incumbent upon the trial court to become the fiduciary for the fund's beneficiaries and to act with 'moderation and a jealous regard to the rights of those who are interested in the fund' in determining what is a reasonable fee to be paid to class counsel for their efforts in settling the litigation and creating the fund. (Cites omitted.)

*Id.*, at 1268. The same reasoning applies to the application for costs in the present case, although some of the plaintiffs are now represented by other counsel who will also represent the interests of the plaintiffs.

■■■ In furthering this duty, when a court makes its initial determination that a case involves a common fund and that it will control the fund established, the court can explain the reasons for the ruling and the procedures to be followed so the litigants will have confidence in the procedure and the necessity for doing so. The court can explain that the common fund doctrine rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense. *Boeing Company v. Van Gemert, et al.*, 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980), see, e.g., *Mills v. Electric Auto–Lite Co.*, 396 U.S. 375, 392, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). Further, as explained by the First Circuit Court of Appeals in *In re Nineteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litigation*, 982 F.2d 603 (1992):

A court supervising mass disaster litigation may intervene to prevent or minimize an incipient free-rider problem and, to that end, may employ measures reasonably calculated to avoid "unjust

enrichment of persons who benefit from a lawsuit without shouldering its costs." Such courts will most often address the problem by specially compensating those who work for the collective good, chiefly through invocation of the so-called common fund doctrine. In its paradigmatic formulation, the common fund doctrine permits the trustee of a fund, or a person preserving or recovering a fund for the benefit of others in addition to himself, to recover his costs, including counsel fees, from the fund itself, or alternatively, from the other beneficiaries.... Although common fund cases are sui generis, they typically evince certain characteristics. These include ease in identifying the persons, or classes of persons, benefitted by the recovery; ease in tracking the benefit flow; the ability to trace benefits with enough accuracy that, in the end, the flow chart inspires confidence; and the ability to shift litigation costs with enough precision and reliability that cost and benefit are fairly proportionate to one another. (Cites omitted.)

*Id.*, at 606. As this case presently stands, the plaintiffs are suspicious of their attorneys, having filed suit against them in 2000. The plaintiffs complain that they were never told what the 2.5% was for and were never given an accounting of the money. The attorneys, relying on the state court's acceptance of their letter agreement, stopped keeping records of the costs incurred and have had to re-invent the records as best they could. It is not a matter of the attorneys disobeying the orders of the court; it is a matter of the attorneys relying on the court's acquiesce of the letter agreement. Due to this reliance, the attorneys thought that all of the 2.5% money was theirs[5] and paid other

---

5. The July 16, 1998 letter agreement provides, in pertinent part: "Regarding the PSC's claim for attorney's fees/costs in the above referenced matter, this is to confirm that the PSC and non-PSC counsel have agreed, as evidenced by the signatures below, to escrow 2.5% (two and one half percent) of gross

expenses out of this fund, not related to the Georgia Gulf litigation. When the complaining plaintiffs obtained a copy of the expenditures through discovery, and saw these other expenses, they were furious and accused the attorneys of being extravagant and wasting their money. Since the state court did not control the funds and approve the costs, the plaintiffs did not have confidence in the procedure and did not know why they were being charged 2.5% for costs.

■ Even though the state court accepted the letter agreement, this Court is not bound by the agreement between counsel[6] and is not bound by the state court's order. Although the state court's order becomes federalized when the action is removed to federal court, it remains subject to reconsideration just as it had been prior to removal. 28 U.S.C. § 1450; *Resolution Trust Corporation v. Northpark Joint Venture, et al.*, 958 F.2d 1313, 1315 (5th Cir.1992), citing *Nissho–Iwai American Corp. v. Kline*, 845 F.2d 1300, 1303 (5th Cir.1988). If the costs had been approved as the case proceeded, the attorneys would have had to maintain their records and would have been able to explain the expenditures at the time they were incurred and reimbursed. This case has been proceeding since 1996, incurring expenses every year since then. One thing lost during this time was the memory of the attorneys incurring these expenses. Since the attorneys have relied on the agreement and were no longer required to keep contemporaneous records,

this Court determined to receive the reconstructed evidence of the costs incurred over the past four to five years and, in the event the proven costs were relatively close to the 2.5% amount, or higher, the Court would approve the 2.5% as being reasonable under the circumstances without approving a certain dollar amount. In the event the proven costs were substantially less than the 2.5% amount, then the Court would have to approve a certain dollar amount. The GGLG attorneys determined that they would wait for a ruling on the costs allowed before they made a decision of whether to seek additional attorneys' fees for the work performed on the PSC. Although this procedure is not the normal procedure, it is one that is required by necessity. See, *In re Air Crash Disaster at Florida Everglades on December 29, 1972*, 549 F.2d 1006, 1012 (5th Cir.1977).

Previously, the Court determined to categorize costs into litigation costs, distribution costs and administrative costs. Litigation costs include the typical costs of maintaining a lawsuit, such as expert witness's fees, filing costs and staff attorney costs which were for the benefit of the group. Administrative costs are those that are unique to a case where a plaintiffs' steering committee is appointed, such as the costs of notices, copying costs and any staff costs associated with the administration of the cases. The distribution costs are those associated with preserving the fund and making the distributions to the plaintiffs.[7] As explained in the Court's Amended Ruling and Order of June 7,

---

recovery from all settlements or judgments in non-PSC cases in consideration for the PSC's work regarding liability discovery up to settlement or trial of the PSC's cases, whichever comes first, and that no further amounts for costs/fees will be sought by the PSC. The PSC is to carry all such costs prior to payment of any settlement or judgment...." Exh. 4 to Joint Motion to fix Method of Determining Costs Sought to be Charged by Former Attorneys for Settling Plaintiffs, and for Stay of

State Court Suit Brought by Former Attorneys on Such Issue, Dkt. No. 87, *Adams v. Georgia Gulf Corp., et al.*, Civil Action No. 98–1066.

**6.** See, *Strong v. BellSouth Telecommunications Inc.*, 137 F.3d 844 (5th Cir.1998) and *Foster v. Boise–Cascade, Inc.*, 577 F.2d 335 (5th Cir.1978).

**7.** See, *In re Combustion, Inc.*, 968 F.Supp. 1116, 1130 (W.D.La.1997).

2001, these examples were not to be considered as exhaustive; they are merely demonstrative and evidence would be received for other costs not listed.

● LIABILITY AND OTHER NON–MEDICAL EXPERTS AND RELATED EXPENSES

 Starting with the least controversial expenses, the Court finds that all of the liability experts' expenses were for the common benefit of all plaintiffs. In accordance with the testimony of Mr. Lewis Unglesby, Mr. Robert Schmolke and Mr. Donald T. Carmouche, no one knew what chemical caused the injuries to the workers at the time of the release. At first Georgia Gulf was blaming the injuries on "bad gas" obtained from other defendants. (Tr. P. 462.) The PSC had to hire experts, such as the Gas Processor's Association, to disprove this theory. In order to determine what chemical was causing these injuries, a lot of the plaintiffs would bring the attorneys samples of the dirt and water at the plant, their clothes, or anything else they could find that was in the area at the time so it could be analyzed by the experts. (Tr. P. 723.) In connection with the expert's expenses, the PSC incurred expenses from Chemron, Inc. for storage costs for these and other samples which are also accepted as common benefit expenses. (B.273–282.)

It was not until around October 31 that Harmony told its employees that they had been exposed to nitrogen and sulfur mustard agents. (Tr. P. 722.) Other chemicals were involved, but they are more well known. Even with the identification of the mustard agent, the PSC still had to have its experts figure out how a mustard agent could be produced from the processes utilized at Georgia Gulf. Mr. Unglesby testified that the process at Georgia Gulf was not supposed to make a mustard agent, that one cannot go buy a mustard agent, that a mustard agent could not legally be produced and that it did not naturally occur in any kind of chemical procedure. (Tr. P. 463.) Mr. Schmolke testified that there were only a few experts in the field of mustard gases, one of which was the Department of Defense and its officials refused to help. (Tr. P. 710.) Harmony later stated that it came from its VCM unit (vinyl chloride monomer unit). The PSC didn't know what a VCM unit was, so they had to hire engineers to explain it to them. (Tr. P. 722.) The engineers had no idea how a VCM unit could ever synthesize mustard gas because they didn't know what mustard gas was. (Tr. Pp. 722–723.) Each discipline had to help each other out, literature had to be obtained and studied and each expert had to educate himself or herself about mustard agents. Further, other experts had to be hired as Georgia Gulf came up with different theories for the injuries. For example, Failure Analysis Associates had to be hired to disprove that spider cracking in some tubing and piping allowed some other chemical to leak and cause the injuries. (Tr. Pp. 724–725.) It was Dr. W.E. Billups and Mr. Phil Koewwn who finally determined what happened, so it was the PSC who told Georgia Gulf how the mustard agent was produced.[8] This most certainly benefitted all plaintiffs.

8.
● He's an organic chemist, Dr. Billups, and he, he was excellent. . . .
He's the guy that could tell you what chemicals it took in that environment, a direct chlorination reactor at 245 degrees F ad 25 psig, having ethylene come in and chlorine come in, having ferric oxide in there as a catalyst, what did you need to make this? You needed reactive nitrogen, not the 78 percent stuff we've got around here. That's inert nitrogen. We needed reactive nitrogen. So then we had something to look for.
Well, where do we store ethylene in Louisiana? In salt domes. There's tons of ammonia in salt. And then we knew where to start

The experts not only worked on the cause of the accident, some of them were instrumental in coaching the attorneys for depositions of defendants' experts and witnesses. Dr. Clayton Callahan and Dr. Knopf, engineers, helped Mr. Schmolke and Adele Owen to devise the first set of questions for Mr. Schmolke to take the first deposition of Georgia Gulf's VCM manager, or its plant engineer. (Tr. P. 723.)

Other non-medical experts included Mr. Bret Talbot and Mr. Henry Guidry. These two experts were consulted concerning the financial condition of Georgia Gulf. Mr. Talbot was the CFO of Shaw Industries, an international company located here in Baton Rouge, La. and Mr. Guidry was from Henry Guidry, Inc. They were able to tell the PSC that Georgia Gulf was having problems getting its cash flow loan refinanced due to the pending litigation. They were informed that Georgia Gulf had told its creditors and Wall Street that it would have this litigation taken care of by the end of 1999 and that it had enough money to cover it. If Georgia Gulf did not get the case settled by the end of 1999, it was not going to be able to refinance any-

thing and it was going to be in trouble financially. Mr. Talbot helped during the negotiations by participating in telephone conferences and countering some of the arguments by Georgia Gulf and continued monitoring the financial condition of Georgia Gulf through September, 1999, as most of the settlements were not finalized until October or November of 1999. (Tr. Pp. 731–733, 741.) This information helped all plaintiffs in getting this matter resolved.

The Court will recommend that the following expenses for liability and other experts and related charges be found to be reasonable and for the benefit of the group:

1. Bret Talbot, financial consultant re.:Georgia Gulf (B.259–272) $ 2,562.50
 - Chemron, Inc., sample storage (B.273–282) 1,620.00
 - Dr. Clayton Callihan, chemical engineer (B.288–293) 9,500.00
 - Diane McRee Assoc., mustard gas research (B.309–319) 17,444.58
 - Reimburse Unglesby for Diane McRee (B.3830–3833) 1,000.00
 - Dr. W.E. Billups, organic chemist (B.551–558) 12,596.37

looking. And then we put our forensic consultant on that, Phil Koewwn.
Well, with 50 tons—the flow rates on these things are just astronomical, a hundred tons of chlorine and 50 tons of ethylene a day. Well, if you got three-tenths. of a part per million, that doesn't sound like much, but, if you're running that many tons through there in a day and it's a high boiler. It won't boil and go out. The only way out of this reactor is in a vapor. So if it doesn't boil at 245 degrees, the maximum temperature of the reactor, where does it stay? It stays right there and builds up and builds up. And ultimately—I don't want to go into all that—but that's how it happened.
- Did he provide—
- It was in their ethylene feed.
 . . . . .
- I mean, to make it worse, Georgia Gulf's screening of their ethylene feed didn't read

as low as three-tenths of a part per million. So they never detected it. We had to do that. If you don't have something that reads—you know, we found out another thing about that stuff.
When you're testing for something, if you don't tell the mass spec what you're looking for, or at least have it in its library, it ain't going to find it. Now who's going to have mustard agent, all these local labs. That stuff had to be sent out to Bethesda, Maryland and over to Salt Lake City to OSHA and to the Department of Defense to verify this stuff. It was a tough case.

- Dr. Rosebrook, chemist with Endo-Environment (B.448) 8,389.16
- EndoEnvironment, Dr. Rosebrook, chemist (B.600–683) 19,065.86
- Dr. Carl Knopf, VCM expert (B.695–704) 4,050.00
- Failure Analysis Associates, engineers (B.792–795) 3,853.23
- Gas Proccessors Association, gas processing research (B.815–817) 147.50
- George Carmouche, DEQ records research (B.821–829) 23,771.83
- Grimm Engineering (B.843–950) 160,790.44
- GRP and Associates, engineers (B.951–959) 3,773.50
- Harcourt Brace, book, Chemical Warfare Agents (B.960–962) 160.43
- Henry Guidry, risk management consultant (B.963–964) 1,000.00
- Howell Martyn, insurance issues (B.984–985) 1,000.00
- Talbot, Carmouche & Marcello (B.3793–3795) 4,087.28
- MarChem, Inc., chemist (B.1357–1369) 5,471.14

TOTAL EXPERTS AND RELATED COSTS $280,283.82

Other charges for experts were paid for directly by the attorneys and the attorneys were reimbursed. These expenses are included with other charges and will be dealt with in the miscellaneous section of this report and recommendation.

- **MEDICAL EXPERTS AND RELATED CHARGES**

■ The expenses for the medical experts consulted are certainly no problem. Their work benefitted all plaintiffs in establishing causation for all plaintiffs. However, the GGLG seeks to charge some of the individual medical expenses incurred by the plaintiffs to the common fund. These expenses are usually charged directly to the individual plaintiffs incurring the expenses. In a normal exposure case, where the chemical is a known agent, the plaintiffs go to their family doctors and are treated individually. The doctors have no contact with the attorneys, except to request medical reports and to take their depositions, so there is no benefit to anyone but the individual plaintiff. In the present case, however, this is not what occurred.

As indicated above, little was known about mustard agents at the time of the release, and few people knew anything about the medical consequences of being exposed to it. One of the only experts found, outside the Department of Defense, was Dr. Annet Aasted from Denmark. She was the only person who had studied people for a long period of time who had been exposed to mustard agents. (Tr. P. 604.) She was invaluable in identifying the types of injuries that can be inflicted due to a mustard agent. The experts and the treating physicians had to work together to understand what was happening to the plaintiffs and what caused the symptoms. The PSC initially hired Dr. Dave Davis, a retired surgeon, to coordinate and educate the various doctors they would need, but eventually Dr. Nesetta took over this job. (Tr. Pp. 607–608.)

Mr. Unglesby explained that most treating physicians are not necessarily interested in undertaking research to find the cause of an injury, they are more interested in just treating it. In this case, they had to use their experts to educate the treating physicians as to the effects of the mustard agents and other chemicals the plaintiffs were exposed to. As explained by Mr. Unglesby:

And so here are these—we're bringing in a group of treating physicians, pulmonologists, gastrointerologists [sic], all, probably a dozen disciplines, and we're having to impose on them and say,

"Would you please read these articles? Will you please talk to these experts? Will you please come to a meeting and let people make presentations to you so that you're more knowledgeable about how these chemicals may be the reason why you've got 25 people in front of you that need punctle plugs, or whatever." (Tr. P. 465.)

Further, they had to have a special software program developed in order to keep track of the various symptoms of the plaintiffs. (Tr. P. 730.) Mr. Unglesby theorized that a defense expert will attempt to associate these various symptoms with the age of the person, his/her weight or the fact that that person is a smoker. In order to rebuff these allegations, it was necessary to be able to prove that there were, for example, "a hundred and twenty-five people like Client Jones and they're all between 30 and 40 years old and all these things that have happened to them don't normally happen to people who have genetics, smoke cigarettes, are overweight, etc., etc., until they're 60, . . . ." (Tr. P. 467, 730.) They had to have this "crass epidemiological" (Tr. P.468) information in order to help prove causation. It also helped the other non-PSC attorneys with their clients. If one of them had a certain symptom that the physician could not understand, they were able to pull up all the other plaintiffs with that same symptom and give that information to the doctor. In that way, the doctors could consult one another and better understand what they were dealing with. It also helped in settlement as they were able to tell the defendants the number of individuals that suffered from the same symptoms and that there was no other explanation other than the exposure. (Tr. Pp. 358–360, 364, 416, 468.)

So, in this case, the information gathered from all of the treating physicians created the basis for proving causation and for helping other plaintiffs receive the proper treatment. It was the knowledge collected by the doctors, bit by bit, in treating the various plaintiffs that was beneficial to all the plaintiffs. The PSC controlled which doctors the plaintiffs were seeing so they could help the doctors understand the problems better, keep track of the various symptoms and build this raw data into valuable information to present to the defendants. (Tr. P. 607, 614.) It was as though the doctors had a specialized control group from which this "crass epidemiological" information could be pulled. It was vital to the case that this information be gathered from all of the doctors. Without the collected data, none would have benefitted.

The individual expenses the GGLG seek to charge to the common funds are the expenses of Dr. John Clifford and Dr. Oscar Rogers. Mr. Michael B. Clegg, Esq. testified that Dr. Clifford is a neurosurgeon who worked closely with Dr. Oscar Rogers and Dr. Zuckerman, neurologists, in treating the plaintiffs with headaches, tremors, dry eye syndrome and all kinds of neurological problems that no other discipline could put its finger on. Dr. Clifford was given information on mustard gases to study to help tie these symptoms to the exposure and worked with the other doctors in trying to make this connection. (Tr. Pp. 606, 613.) Since these plaintiffs were sent to these specialists in order to determine causation, the Court will approve these expenses as common benefit expenses as a determination of causation helps all of the plaintiffs.

This is also true for the psychologists and psychiatrist. Dr. Louis Cenac was first hired to perform the psychological testing, however, Dr. Cary Rostow and Dr. Robert Davis of Baton Rouge Psychological Associates were later hired and per-

formed all of the testing. (Tr. Pp.605,608.) The PSC first went to these doctors and explained what had happened to the plaintiffs, explained their fears and educated these doctors on the chemicals involved. (Tr. Pp. 524530, 608–609.) These doctors tested over 200 plaintiffs in order to develop the fear and fright damages and to help the attorneys pick out their bellwether plaintiffs. The doctors made sure that the profiles of the bellwether plaintiffs matched those of the other plaintiffs. (Tr. P. 608–610.) Furthermore, the workers' compensation carrier reimbursed a lot of the expenses, which, in effect, allows credit for any individual benefit. Thus, only about $55,000.00 was charged out of the approximately $170,000.00 expenses incurred.

The GGLG proved that these expenses were incurred and that they benefitted all plaintiffs—PSC clients as well as non-PSC clients. The opposition proved that these expenses were for the benefit of individual plaintiffs, but they did not disprove that these expenses benefitted all of the plaintiffs. Under these unusual circumstances, the Court will recommend that all of the medical expenses of these specialists submitted as common benefit expenses be approved.

The medical and related expenses recommended for approval by the Court as being for the common benefit are as follows:

- Diversified Consulting, medical consultant (B.320–321) $ 20,000.00
- Dr. Annet Aasted, medical consultant & wire transfers

(B.322–335, PSC Exh. 34, 35) 65,499.66

- Dr. Annet Aasted, depo. (B.684–691) 4,127.04
- Legal World Inter., interpreter for Dr. Aasted dep.(B.1300–1305) 441.00
- Dr. Carl Ludvigsen, toxicologist, medical consultant (B.336–406) 63,895.05
- Dr. Dave Davis, Div. Cons., medical consultant (B.446 447) 15,000.00
- Dr. Legator, Univ. of Texas Med. (B.487) 50,000.00
- Dr. Kimberly A. Meng, DDS, Ph.D., conf. in Hammond, La.

(B.1287–1289) 500.00

- Dr. Jack Waxman, rheumatologist, medical research (B.452–482) 3,600.00
- Debra L. Morris, Dr. Legator's assist. (B.305–308) 1,000.00
- Dr. Leroy Joyner, pulmonologist, symptom survey (B.488–489) 125.00
- University of Texas, Medical Branch, symptom survey(B.3817–3821) 1,465.36
- Dr. Gouvier, consultation, expert-neuro psy. (B.449–451) 400.00
- Dr. Russell Saloom, depo. (B.545–547) 400.00
- Dr. Stephanie Cave, medical consultant (B.548–550) 1,000.00
- Dr. William Nassetta, medical causation coordinator (B.559–583) 108,792.00
- Dr. Yuruk Iyriboz, depo. (B.584–585) 2,000.00
- Family Therapy Clinic, Drs. Gouvier & Pinkston,

Psy. Experts (B.796–798) 4,000.00

- Information Research, medical research (B.1190–1192) 178.03
- La. State Medical Society, Med. Directory of La. doctors(B.1355–1356) 57.00
- Pulmonary Disease Clinic, consultant (B.2065–2067) 54.00
- Reimburse Unglesby for Dr. Cave (B.3822–3823) 245.00
- Reimburse Unglesby for Dr. Cave (B.1426) 249.00
- Network Support Services, client database (B.1899–1901) 10,584.00
- Baton Rouge Psychological Assoc., (B.100–254) 146,885.00

- Work. Comp. Refund for B.R. Psych. Assoc. (N/A) (111,935.00)
- Dr. Cary Rostow, Psy. (B.407–445) 15,-465.00
- Work. Comp. Refund for Drs. Robert Davis & Rostow (N/A) (4,400.00)
- Dr. Louis Cenac, psychiatrist (B.490–496) 1,481.43
- Dr. Robert D. Davis, psychologist, B.R. Psych. Assocs. (B.502–544) 8,949.00
- Work. Comp. Refund, R D Associates, psychologist (3,400.00)
- Reimburse Schmolke for B.R. Psych. Assoc. (B.2824–2843) 75.50
- Dr. John Clifford, neurosurgeon (B.483–486) 11,280.00
- Dr. Oscar Rogers, neurologist (B.497–501) 300.00

TOTAL MEDICAL COSTS $ 418,313.07

Again, other charges were paid for directly by the attorneys and will be listed as a reimbursement to the attorneys on the Common Expense List, (Exh. PSC 1). These expenses are included with other charges and will be addressed in the miscellaneous section.

In order to verify the above charges, most of the underlying documents (Exh. PSC 2) were reviewed and compared for duplicate billings and any references to the Georgia Gulf litigation or other identifying notations on the billings were observed. A more detailed analysis was performed on some of the other charges. For example, the charges for Dr. Cave were reviewed and compared and the Court determined that the charge for $1,000.00 (Exh. 1, p. 5, ck.1551) was incurred March 24, 1998, the $245 charge (Exh. 1, p. 19, ck.104) was paid February 4, 1997 and the $249 charge (Exh. 1, p. 12, ck.1121) was paid January 9, 1997. None of the charges appeared to duplicative and were approved. The charges to Diversified Consulting, owned by Dr. Davis, and the charges made direct-ly by Dr. Dave Davis were compared for duplication and none were found.

## III. TRAVEL AND RELATED COSTS

■ The travel and related expenses were then reviewed. Some of the deposition times and travel times for taking the experts' depositions were compared. Of course there were more travel charges than out-of-town depositions as the PSC had to travel and meet with their experts and other consultants. Further, the number of passengers in the chartered flights were compared with the number of people attending the depositions, and limo and hotel charges were spot checked. For example, Exh. PSC 12 shows that the deposition of E. Schmitt, II was taken in Atlanta, Ga. on June 10, 1998 through June 11, 1998. It also shows that ten (10) plaintiffs' attorneys attended. PSC Exh. 1 and 2 show (B.1349–1351) that six (6) passengers were on a chartered flight from Baton Rouge to Atlanta on June 9 and returned June 11, 1998. Bates numbers 1884–1887 show the hotel charge for Michael Clegg from June 8, 1998 through June 11, 1998. The hotel charge for Robert Schmolke, $975.41 (B.2355), is included with his reimbursement for $10,237.49 in check number 1941 on September 23, 1998. Limousine charges on June 9 are reflected at Bates 1354 in the amount of $719.40.

In most cases, the expenses for limousines were first reduced by any stand-by time and then only one-third of the limousine charges were charged to the group. (Tr. Pp.162–163.) Limousines and chartered planes were often used by the attorneys due to the number of people involved and the large number of documents they had to take with them. (Tr. P. 162, 235.) The chartered flights were also for the convenience of being able to fly at a time when a commercial flight was not available. Many of the chartered-flight bills

show that they were able to fly to their destination and return in the same day, thus saving hotel and food bills. On September 2, 1997 (B.1324), Mr. Schmolke chartered a flight to Houston, Texas and reduced the $1958.50 bill to $1416.00. He returned on the same day, however there was a 13 hour stand-by charge for the pilot amounting to $260.00. The $260.00 stand-by charge was cheaper than a hotel room during that time. Bates 2310 shows that the charge for a one-night stay at that time was about $450.00 [9]. If the Court assumes that the stand-by time was for the time spent on the ground in Houston, this would mean that Mr. Schmolke had a long day and a stay over would have been totally justified. Further, several bills were reduced when they really should not have been.

Bates number 1553 shows that a round-trip ticket on a commercial plane to Houston was around $591.00.[10] On December 16, 1997 a plane was chartered for five (5) people to travel to Houston. The total bill was $2429.92, but this was reduced to $1416.00. If a commercial ticket costs $591 per person, the total bill for all five (5) people to travel to Houston on a commercial plane would have been $2955.00. Thus, the GGLG should have charged more for this flight instead of reducing it. The same was true for the flights on November 11(B.1334–1336) and November 25, 1997 (B.1339). Neither of these flights were reduced, however, the bill could have been increased from $2389.16 to $4137.00 and from $2036.95 to $2955.00, respectively.

The Court finds that using chartered flights and limousines under these circumstances was reasonable and the expenses, thus reduced, should be approved.

Of course, certain inconsistencies were also found, but none were of major consequence. For example, in cross examination (Tr. Pp. 504–506) it was pointed out that there is a charge for $143.00 (Exh. 1, p. 19, ck.1822) for a oneway ticket to Atlanta, Ga. on June 10, 1998 (B.3856) and another charge for $133.00 (Exh. 1, p. 19, ck.3058) was made for a one-way ticket to Atlanta, Ga. on the same day (B.4084). The charge at 3856 shows that the original cost of the ticket was $133.00, but with an added service fee, the total bill was $143.00. Apparently this is a duplicate charge and should be taken out. The $133.00 charge will be eliminated. Another example is found on Bates 3350. Mr. Lindsay pointed out on cross examination of Mr. Schmolke that there was a $20.00 charge to this case that should have been charged to the state case. (Tr. Pp. 824–825.) There also appears to be duplicate charges at Bates 810, 811 and 2020 in the amounts of $341.24, $376.11 and $539.42. These will be disallowed as well. Other charges were found that were not correctly charged to the common benefit, especially during the examination of Mr. Clegg (Tr. Pp.869–885), but these will not be listed as they would amount to probably less than $4,000.00 and would not alter the results.

The Court has been unable to locate the charges for food items that are necessarily incurred when traveling out of town. A few of the hotel bills may contain charges for food, but the court did not check all of them. Apparently, these charges were not submitted for reimbursement, but reasonably could have been. It was the testimony of Mr. Stephens that no meal charges were made to the group. (Tr. P. 163.)

9. There is no evidence as to how many people stayed in the room at this time and no evidence as to how much was for food or other items.

10. Mr. Stephens testified that they determined the commercial costs of the tickets by using the Internet, but the exact amount used was not put into evidence.

These inconsistencies and deletions are not unusual in a case of this size, and, of course, are more prevalent in this case since the expenses have been reconstructed. Mr. Shelby Easterly, III testified at the hearing of this matter and indicated as much. He was accepted by the Court as an expert in the field of litigation, administrative and distribution costs in mass tort actions. (Tr. Pp. 27 & 33.) Mr. Easterly has been appointed special master in several mass tort, or class actions, to review, analyze and recommend amounts for fees and costs in those matters. (Tr. Pp. 22–33.) In approving the costs in these other cases, Mr. Easterly testified as follows:

> I, myself, would come along and I would look to verify (a) that the costs and expenses were generally what I would expect if I were involved in the litigation as a plaintiff. And I've hired a lot of expert witnesses. I know that they're expensive. I've paid for a lot of transcripts. I know court reporters can get expensive. But to look at those and then look to see if there's anything in a spot check that really causes me concern before I recommend to a court, both in writing and orally, that I think it is a fair and reasonable cost to be assessed and charged.

> Do I audit each and every item? No, your Honor. It would be impossible to audit it. It would be—it would be economically unreasonable for a certified public accountant to conduct what they call an audit where they trace back everything. And do we miss costs? I'm certain that we have. Have we included a cost that maybe should not have been over the years? I'm certain that we have. But in terms of economic feasibility to get these matters examined, I think the work product we come through with is pretty good. It hasn't been written up on the front page of the Times-

Picayune or the Advocate yet, and I hope it never will be.

(Tr. Pp. 83–84.)

An objection was made to the fact that several attorneys attended each deposition and in one case, ten plaintiffs' attorneys attended. (PSC Exhs. 12 & 13, June 10–11, 1998 dep.) There was even a suggestion that the state court judge ordered the PSC to have only two attorneys attend a deposition. (Tr. Pp. 768–769.) However, the state judge had ordered that only two attorneys conduct a deposition as the defendants did not want a multiplicity of lawyers bombarding them with questions at each deposition. (Tr. P. 769.) Mr. Schmolke testified that it was invaluable having the other attorneys present during the depositions. He testified:

> A That's different from having them come. Lewis Unglesby, Jerry McKernan and the Group I had are some of the most accomplished trial lawyers in the South. Lewis could bend over and whisper in my ear some of the most invaluable stuff. He couldn't open his mouth, but having him there, or Jerry, was priceless to my clients.

(Tr. P. 769.) The Court finds that it was reasonable to have this number of attorneys attend the depositions due to the complexity of the matters involved and the number of interests represented and will recommend that all travel expenses be approved as for the common benefit of the group.

The following travel and related costs are recommended for approval as expended for the common benefit of the group:

- American Express (B.1–7) $ 5,129.93
- City National Bank (B.283–287) 13,-192.39
- First Bankcard Center & First USA (B.799–807, 812–814) 5,774.04

- Gordon McKernan (B.830–841) 1,900.23
- Holly Clegg–Mike Clegg Reimb. (B.981–983) 1,132.91
- La. Aircraft, Inc. (B.1306–1333) 11,-416.33
- La. Aircraft, Inc. (B.1334–1354) 12,-694.05
- McKernan Law Firm (B.1488–1495, 1540–1558) 1,725.36
- McKernan Law Firm (B.1616–1629) 1,438.48
- *Michael V. Clegg* (B.1861–1863, 1868–1871) 971.16
- *Michael V. Clegg* (B.1884–1887) 1,224.98
- Paymentech (B.2013–2019, 2021–2036) 12,239.97
- Riverside Transportation (B.2139–2144) 527.33
- Robert H. Schmolke (B.2153–2211, 2212–2283, 2284–2345, 2346–2483, 2537–2549, 2553–2658, 2789–2823) 34,-349.12
- Talbot, Carmouche & Marcello (B.3485–3487, 3495–3497) 1,025.39
- The Ritz Carlton (B.3796–3798) 1,660.54
- Unglesby, Koch & Reynolds (B.3834–3837, 3838–3839, 3855–3856, 3869–3872, 3918–3919, 4070–4099) 5,471.55

TOTAL TRAVEL AND RELATED COSTS $110,763.76

- COURT REPORTING COSTS

■ The charges for the court reporter services in connection with the depositions of the experts should be listed in this section as litigation costs. Ms. Adele Owen, the associate attorney working with Mr. Schmolke as liaison counsel and lead counsel on the issue of liability, testified

that about 82 liability experts' depositions were taken, including seven PSC experts. (Tr. P. 341, PSC Exh. 12.) Further, although over 800 depositions were taken of the plaintiffs, Mr. Carmouche testified that they obtained copies of only a few of the plaintiffs when they felt the testimony was important. The deposition testimony would have to be important to the issue of liability, to a particular medical problem, or the plaintiff would have had to be a trial, or bellwether, plaintiff in order for them to order a copy of the deposition. (Tr. Pp. 855–857.) These purposes are for the common benefit of the group and the Court will recommend that these expenses, $2,888.30 (B.1373 1380), $377.00 (B.1381–1383) and part of the $3,053.30 [11] (B.1384–1392), be approved as common expenses.

To get just a rough idea of the individual costs of these depositions, the Court divided the total amount charged, reduced by the $2,888.30 and $377.00 above, by 82 and 75 (82–7) depositions and determined that each expert deposition would cost approximately $600.00—$700.00. This is a reasonable amount for expert depositions (B. 1389 & 1390), and should be charged as common benefit expenses. Some of the court reporters' charges are also included in the reimbursements to the attorneys and will be included in the miscellaneous section since they are mixed with other types of charges.

The following court reporter charges are recommended for approval as reasonable expenses incurred for the common benefit of the group:

- B.R. Court Reporters (B.19–99) $ 23,-826.03
- Comtrol Lab Services (B.297–299) 650.00

---

11. Part of the expenses for check no. 2475 were for expert witnesses and part were for

plaintiffs.

- Gaudet, Kaiser, et al. (B.818–820) 883.00
- Innovations Reporting & Video, Inc. (B.1193–1208) 4,349.01
- Janet L. Parker & Assoc. (B.1215–1232, 1258–1286) 13,697.64
- Marker's Court Reporting (B.1373–1380) $ 2,888.30
- Marker's Court Reporting (B.1381–1383) 377.00
- Marker's Court Reporting (B.1384–1392) 3,053.30
- Nat Douget Court Reporters (B.1897–1898, 1902–1904) 840.75
- Prof. Services Bureau (B.2060–2064) 280.00
- Talbot, Carmouche & Marcello (B.3657–3691) 140.80
- Videofacts (B.4132–4134) 951.50
- Worley & Assoc. (B.4135–4137) 950.00

TOTAL COURT REPORTING COSTS $ 52,887.33

- NURSING EXPENSES

 Next, the Court must consider the expenses of the nurses hired in this matter. The nurses were hired to take the medical and work histories of the plaintiffs, to assign the plaintiffs to different doctors depending on their symptoms, to make reports and consult with the treating physicians. (Tr. Pp. 607, 614–616.) Certainly the time the nurses spent consulting with the doctors and performing other functions would benefit all plaintiffs as these consultations and research helped the doctors prove causation. At first glance, the time spent interviewing the plaintiffs and assigning them to doctors seems more attenuated, however, this information was obtained from the plaintiffs well before discovery began. Sandie Van Oss started the interviews in August of 1997(B.3370) and discovery of the plaintiffs did not begin until June of 1998 (Tr.

P.452). If this information had been obtained solely for the purpose of answering discovery requests, there would be no benefit to the other plaintiffs. However, this information was used to form the data base of symptoms and injuries the plaintiffs had in order to direct the plaintiffs to the correct doctor and to submit to the doctors for their consideration regarding causation. As explained above, this inform was invaluable in helping prove causation and should be allowed as a common benefit expense. Thus, the following expenses, less any Holiday Inn expenses, are recommended for approval as having benefitted the group:

- Jeri Hinds, Bates 1253–1257:

B.1253–1254 $ 1,150.00

B.1257 interviews: 3 hrs × $50/hr. = $150 150.00

B.1257 transcription to updated format 587.50

B.1257 Meetings and seminars 10 hrs.–7 hrs.@

Holiday Inn = 3 hrs. × $50/hr. 150.00
$ 2,037.50

- Kris Fryoux, Bates 1293–1299:

B.1295 interviews: 10 hrs × $50/hr. = $500 500.00

B.1299 converting to new forms (4 hrs.) 200.00

Meetings w/Dr. Davis & meetings (3 hrs.) 150.00

Converting (3 hrs.) 150.00

Interviews (12–7 Holiday Inn) 5 hrs.

x $50/hr. = $250–250.00
$ 1,250.00

- Robin Comeaux, Bates 3355–3360:

B.3357 interviews 19 hrs. × $50/hr. = $950 $ 950.00

B.3360 interviews (22 hrs.–7 hrs. Holiday Inn) =

15 hrs. × $50/hr. = $750–750.00
$ 1,700.00

- Sandie Van Oss, Bates 3361–3407:

B.3361, 3363, 3365, 3382, food $ 248.34

B.3370 1 Aug. '97 interviews $2470–2,470.00

Literature search & review 100.00

B.3372–4 Sept.'97 interviews $5630–5,630.00

B.3375–7 Oct.'97 interviews $6050 6,050.00

Other 300.00

B.3378–9 Nov.'97 interviews $1930 1,930.00

Other 800.00

B.3385–7 Dec.'97 interviews ·$4980 4,980.00

B.3388 Consultation & other 1,350.00

B.3391–2 Jan.'98 interviews $1550 1,550.00

Consultation & other 650.00

B.3395–6 Feb.'98 interviews $1770 1,770.00

Consultation & other 300.00

B.3399–3400 March'98 interviews $2570 2,570.00

Office expenses 183.45

B.3401–2 April'98 interviews $3055–3,055.00

B.3405 May–Dec.'98 interviews $1640–1,640.00

Consultation & other 9,258.38

B.3406–7 April'99 Other 1,620.00 $46,455.17

Work. Comp. Refund for Sandie Van Oss (6,890.00) $39,565.17

TOTAL COSTS FOR NURSES $44,552.67

- INVESTIGATIVE EXPENSES

 Factfinders, Inc. and Investigative Bureau of America, Inc. submitted bills for investigative work. Mr. Schmolke (Tr. P. 725) explained that these agencies took statements from numerous fact witnesses, ran background checks on all Georgia Gulf witnesses, all Georgia Gulf's expert witnesses, and the CEOs of Georgia Gulf.

They also helped find some of the plaintiffs, and Mr. Stephens testified that the bills to find the plaintiffs amounted to about $15,000 and should not be included as a common benefit costs. (Tr. P. 154.) After reviewing the bills, the Court finds that the explanation of the work performed by these investigative agencies are otherwise consistent with the descriptions in the bills and were for the common benefit of the group. For example, Factfinders, Inc. billed for investigative time, pages transcription, photographic costs, reference book, data acquisition, long distance phone charges and video tapes at Bates 762 and 756. These bills were also checked against the bills from Factfinders that were reimbursements to the attorneys and mixed with other charges. The invoice numbers for the bills at Bates 3476 and 3477 are not duplicates of those listed below.

Thus, the total amount recommended for approval as common benefit expenses are as follows:

- Factfinders, Inc. (B.705–791) $ 48,797.02
- Investigative Bureau of America, Inc. (B.1209–1214) 1,702.25

$ 50,499.27

Less expenses for GGLG only $ 15,000.00

TOTAL INVESTIGATIVE EXPENSES $ 35,499.27

- COURT COSTS

The expenses for court costs are next. These petitions were brought as a class action, however the matter was never certified as a class. The receipts for the court costs indicate that the expenses were incurred in various individual suits filed by the plaintiffs. Mr. Ralph Stephens, the CPA, explained that there were several categories of expenses that may contain expenses for the benefit of individual plain-

tiffs, however, since the costs are divided among the plaintiffs in proportion to the amount of settlements of PSC plaintiffs and non-PSC plaintiffs, the costs are disbursed evenly and fairly. He explained:

A. Well, there's a lot of charges in here that would only benefit one group or the other. For example, mileage, or copy costs, or fax costs, or courier costs, in which one group or the other may get the benefit. For example, if they made, copies were made and the copies were just for the PSC clients, or the Georgia Gulf Litigation Group clients, that benefit would be just for them. But, by the same token, as lead counsel, the Georgia Gulf Litigation Group had to make numerous copies for all the attorneys that were not part of the Georgia Gulf Litigation Group, so all those copies have no benefit at all to the PSC clients.

So, you had, you know, copy costs that might have benefitted one, or might have benefitted, the other, or it might have benefitted both, so, you know, that's—the same with fax charges. If you had fax charges that may have been the PSC clients, it may have just been the non-PSC clients, it may have been to both and any number of expenses like that.

Q. List for the Court, if you would, those kinds of expenses like those kinds that you're describing where you could have a benefit just to one group or the other.

A. I mean, the ones we mentioned here, you got copy costs, fax costs, courier services, parking, overnight charges FEDEX type charges. I'm trying to think of others. If I flip through here, I could probably see some more.

Q. Let me ask you this, Mr. Stephens: Did you go back through this 19 Page schedule of all these common expenses and for items like copy costs, postage, telephone, and try to make an exact determination as to every one of those costs of whether it should be charged to the PSC plaintiffs or the non-PSC plaintiffs—

A. No, we didn't.

Q. —or both?

A. No, we didn't. And our rationale was we allocated those costs based on the total amount of the settlements that the two groups had received. And so, the Georgia Gulf litigation Group had gotten about 68 percent of the settlements and the non-PSC group had gotten about 31.8 percent.

So, we figured that by allocating those type of costs that way, according to the percentages, that was a reasonable and fair way to do it. To go back through every copy cost, if the records had been maintained in the first place, to say, you know, these three copies are going to the Georgia Gulf Litigation Group, these four copies are going to the non-PSC, we would be talking about way more accounting fees that we're talking about today.

(Tr. Pp. 155–157.)

The Court will accept this explanation and division of expenses, as identifying every single copy or postage stamp would be cost prohibitive at this stage of the litigation. Lumping all costs together, both common benefit and individual benefit costs, and then charging the largest group of plaintiffs (PSC clients) with 68% of the costs and the smaller group (non-PSC clients) with 31.8% of the costs, appears to be a reasonable method of allocating these costs and fair to all considering that the percentages were obtained by comparing each groups' settlements with the amount of all settlements. These expenses should be allowed.

Again, to verify that the expenses were incurred for this litigation, the receipts were checked for references to case numbers or captions and these references were

compared with the list of state court suits removed to this court. The receipts that were checked, which were most of them, were verified, however, a few charges were found not to be for the common benefit. These expenses are at Bates 3573–3597 for $3,400.00 and at Bates 1402–3 and 1404–5 for $250 and $380 [12], respectively, for filing client contracts in the record. At the hearing, the $3,400.00 in expenses was withdrawn from the list of common expenses as it was not for the benefit of the group. (Tr. P. 169.)

Thus, the following court costs should be allowed as common benefit expenses and will be recommended for approval:

Bates numbers 294–296, 692–694, 986–1055, 1393–1401, 1406–1409, 2145–2146,[13] 3411–3413, 3457–3481, 3712–3728, 3824–3827, 3918–3933

Total court costs before credits $ 18,117.59

Disallowed (630.00)

Credits (444.25)

TOTAL COURT COSTS $ 17,043.34

- COST FOR COPIES

There was a large amount of money spent on postage and making copies in this matter. The Court is cognizant of the fact that these expenses were spread over a four year period and the testimony proved why it was necessary to incur such a large expense for these items. Mr. Schmolke had been appointed liaison counsel and Ms. Adele Owen, the associate attorney working with him, testified that the number of pleadings filed in this matter numbered approximately 1905. Exh. PSC 15 is a list of all the pleadings filed. There were 41 volumes of pleadings that would reach five feet in height if stacked on top of one another. (Tr. P. 318.) Every time the PSC entered a pleading it had to copy at

least thirteen defendants, including insurance companies, (Tr. P. 323.)and the other thirteen plus plaintiffs' counsel (Tr. P. 437). Ms. Owen also extracted and copied the key documents from the 360,000 documents produced by the defendants and put them in separate binders for each defendant. These were the documents with information that was felt to be the most important pertaining to that particular defendant. There were eight to ten of these three-inch binders of documents. (Tr. Pp. 326–327.) She also copied the test results that were run on samples from Georgia Gulf and entered them in a separate notebook. Three other notebooks were kept on three other companies running tests on samples. (Tr. Pp. 327–328.) PSC Exh. 14 shows that 2,770 sample tests results were produced which Ms. Owen would have copied. As mentioned above, a large amount of information on mustard gases was copied and given to the various doctors and other experts used in this matter and the nurses interviewed the plaintiffs and wrote reports on them. Further, there were seventy correspondence files kept by Ms. Owens alone which amounted to approximately 35,500 pages and copies of this correspondence was sent to non-PSC counsel. (Tr. P. 356.) Her office also dispersed any orders coming from the court and had to do mail-outs to defense counsel as well as non-PSC counsel. (Tr. P. 354.) There were at least 13 non-PSC lawyers that had to be copied. (Tr. P. 437.) Other spiral-bound notebooks were kept for each doctor being used. These notebooks would contain copies of the plaintiffs' medical reports so she could have this information available for quick reference when non-PSC counsel called for medical information or for use against Georgia Gulf.

---

**12.** $201.75 (Bates 2550–2552) was subtracted out of Travel & Related Costs.

**13.** Mr. Stephens testified that the $3100.00 charged on Bates 2147–2152 was a duplicate charge.

(Tr. Pp. 358–359,412.) When it came time to take an expert's deposition, Ms. Owen would review the files and document production and copy any pertinent documents she felt might be needed for that deposition. These copies were taken to the deposition instead of the originals. (Tr. Pp. 346–347.)

In order to keep costs down for copying, the PSC eventually bought a copy machine for use solely on this litigation. Of course, other offices had to charge per page as they did not have the machine in their office and when a big job had to get out they sent the job out to a copy company. Further, if the Georgia Gulf machine was busy, they also had to use their office copier. (Tr. Pp. 431–433.) These expenses are also included. What will not be allowed is the $248.17 (B.3799–3804) for installation of the electric receptacle for the machine, which is an enhancement to the building. The machine was purchased from Electronic Business Systems, Inc. for a costs of $22,680.00 and the residual value of $4,350.00 was credited at the end of the litigation. (B.595–599.) The costs of the maintenance contract was also charged to the group, but most of these charges are included in the reimbursements to Mr. Schmolke and have not been itemized. (B.2525.) Mr. Ralph Stephens testified that it was cheaper to buy the machine than charge the plaintiffs per page. There were 440,000 copies made on this machine and if ten cents were charged per page that would be $44,000. As it was, they were charged a net of about 18 cents per page for copies made on other machines. (Tr. P. 164.) Mr. McKernan's law firm charged 15 cents a copy (B.1488–1499), and Mr. Unglesby's firm charged 25 cents (B.3918–3919, 3943–3955), which would have brought the costs up even more if additional copies would have been made on individual office machines. During the hearing, Mr. Rastanis indicated that Mr. Schmolke's firm charged fifty cents a page to make a copy, however, after looking at the example he used, it is apparent that his firm charged only ten cents a copy. (B.2155, Tr. Pp. 770–771.) The Court finds that it was a reasonable expense to buy the copier rather than charge per page and will allow this expense.

In connection with all of these copies, the PSC had to rent two mini-warehouses to store a lot of these documents. Some were also stored at the Schmolke law firm and, of course, each member of the PSC had their own files at their offices. Exh. PSC 20 contains photographs of the warehouse and all of the documents stored therein. The warehouses also contain approximately 360,000 documents produced by the defendants. (Tr. Pp. 328–330.) These costs should be allowed as well.

To verify these charges, the bills were reviewed for references to the Georgia Gulf litigation and almost all of the bills contained this reference. Bates 1153 has two charges, one for $68.17 and the other for $6,844.18, which have references that are not familiar to the Court, however they could easily be for Georgia Gulf. Bates 1123 has a charge which was subtracted from the bill, so it is evident that the bills were reviewed and non-Georgia Gulf charges were extracted. These expenses will be allowed.

The following copy costs will be recommended for approval as being for the common benefit of the group:

- ARI Blueprint & Copy (B.12–18) $ 48.71

- Breazeale, Sachse & Wilson (B.255–258) 2,010.38

- Connelly Press & Copy, Inc. (B.300–302) 158.76

- Eagle Copy Service (B.586–594) 490.88

- Electronic Business (B.595–598) 22,-680.00

Copier Residual Value (B.599) (4,350.00)

- Robert H. Schmolke, A.P.L.C. (B.2280–2283) 162.00
- IKON (B.1056–1189) 64,972.89
- Kinko's (B.1290–1292) 85.87
- McKernan Law Firm (B.1393–1401, 1410–1425) 1,935.28
- McKernan Law Firm (B.1488–1499) 3,714.30
- McKernan Law Firm (B.1558–1564) 1,239.30
- McKernan Law Firm (B.1594–1599) 1,573.20
- Paper Chase (B.1905–2012) 22,550.49
- Quality Litigation Support (B.2068–2138) 15,406.36
- Unglesby, Koch & Reynolds (B.3828–3829) 297.00
- Unglesby, Koch & Reynolds (B.3838–3839, 3842–3854) 43.20
- Unglesby, Koch & Reynolds (B.3918–3919, 3943–3955) 16,167.00

TOTAL COST FOR COPIES $149,185.62

IX. COSTS OF THE MINI-WARE-HOUSES

U Store It (B.3813–3816) $ 12,240.00

- COST FOR POSTAGE

Most of the postage charges are included in the reimbursements to the GGLG, but the following have been set apart. Some of this postage is for mail outs to the PSC clients (B.3444–3448), however, since these expenses are being divided among the plaintiffs in proportion to the amount of settlements, as explained in Section VII. Court Costs, these costs are disbursed evenly and fairly and should be approved as for the benefit of the group.

The supporting documents were spot checked and reviewed for notations of the Georgia Gulf litigation or an account number. The McKernan law firm's account number was 96248. (B.1396, 1410.) Only those charges on the postage meter bills which contain the account number 96248 were charged to the litigation.

The following postage charges were for the benefit of the group and will be recommended for approval:

- Andrea Ehrhardt (B.8–9) $ 24.80
- McKernan Law Firm (B.1393–1401, 1432–1456) 722.28
- McKernan Law Firm (B.1488–1495, 1513–1534) 576.93
- McKernan Law Firm (B.1594–1597, 1609–1615) 611.52
- Schmolke Law Firm (B.2484–2536) 33.75
- State of Louisiana (B.3434–3436) 2.00
- Talbot, Carmouche & Marcello (B.3437–3438) 61.12
- Talbot, Carmouche & Marcello (B.3444–3446) 66.24
- Talbot, Carmouche & Marcello (B.3445–3446) 97.90
- Talbot, Carmouche & Marcello (B.3447–3448) 257.00
- Talbot, Carmouche & Marcello (B.3449–3451) 217.52
- Talbot, Carmouche & Marcello (B.3452–3454) 89.28
- Talbot, Carmouche & Marcello (B.3455–3456) 93.44
- Talbot, Carmouche & Marcello (B.3488–3491) 1,508.00
- Unglesby, Koch & Reynolds, 4 yrs. (B.3918–3919, 3982–4044) 5,914.04
- Unglesby, Koch & Reynolds, 4 yrs. (B.3918–3919, 4045 4069) 4,635.00

- Unglesby, Koch & Reynolds (B.4100–4102) 15.38

TOTAL COST FOR POSTAGE $14,926.20

- COST FOR MILEAGE AND PARKING

Mileage was for running pleadings to the courthouse, taking documents from one office to another or to a doctor's office, picking up experts from airports and going to and coming from airports while traveling. Parking charges for parking while taking depositions are also included in these expenses. Since the costs of the experts and the medicals, etc. have been found to be for the benefit of the group, so too would the associated expenses and these will be recommended for approval. Any benefit to an individual for filing documents in their particular record will be off set by the proportional distribution of these expenses, especially since most of the documents were filed in the consolidated record.

The following mileage and parking expenses are found to be reasonable and for the benefit of the group and will be recommended for approval:

- Andrea Ehrhardt (B.10–11) $ 114.40
- Jeanne Ann Larose (B.1233–1252) 157.08
- Margaret Dugger (B.1370–1372) 9.75
- McKernan Law Firm (B.1393–1401, 1478–1487) 84.80
- McKernan Law Firm (B.1393–1401, 1457–1468) 69.66
- McKernan Law Firm (B.1488–1495, 1502–1512) 59.70
- McKernan Law Firm (B.1488–1495, 1535–1538) 27.72
- McKernan Law Firm (B.1594–1597, 1600–1608) 36.90
- Michael V. Clegg (B.1864–1867) 31.00
- Michael V. Clegg (B.1872–1883) 46.70
- Michael V. Clegg (B.1888–1896) 241.00
- Scott Brady (B.3408–3410) 19.00
- Scott Brady (B.3414–3433) 570.59
- Tom Walker (B.3805–3812) 504.25

TOTAL COST FOR MILEAGE AND PARKING $ 1,972.55

- MISCELLANEOUS COSTS

The expenses from 1996 through about January of 1999 were pooled and include some travel, copy costs, mileage, parking, postage, phone charges and faxes. These are the charges that were first paid directly by the PSC and later reimbursed by P & N with the 2.5% money. Again these charges were checked for references and account numbers. Bates 1637–1640 show the Georgia Gulf account number of 96248 for the copies charged for the McKernan law firm and show GG reference on the mileage charged through Bates 1641–1652. Further, the supporting data were checked on most of the charges. Bates 1397 shows a $5.40 charge for copies and Bates 1422 supports this charge for account 96248. Bates 1414 supports the $39.00 charge at Bates 1396 and Bates 1637 supports the $658.05 charge at Bates 1631. The list of expenses incurred by the Schmolke law firm are self explanatory and reference the Georgia Gulf litigation. Likewise, the supporting data references the Georgia Gulf litigation as well. (B. 2898 3354.) The bills and supporting data from the Talbot, Carmouche & Marcello and Unglesby, Koch & Reynolds law firms were also reviewed and checked for references and duplications. For example, Bates 3599 shows that $177.75 was paid for a copy of the deposition of Zachary Smith taken on 9–11–98. Bates 3698 also shows a payment for the deposition of Zachary Smith, however, the supporting data shows that the $177.75 was paid for Zachary Smith, IV (B.3602) and that $216.00 was paid for the deposition of Zachary B. Smith, III (B.3704), therefore, these charges are not duplicates. Further, most of the documents contain references to the Georgia

Gulf litigation or are on separate expense sheets for this litigation. (B.3903–3905.)

The following costs are found to be reasonable and for the benefit of the group and will be recommended for approval:

- McKernan Law Firm (B.1393–1401, 1427–1431) 103.95
- McKernan Law Firm (B.1393–1401, 1469–1477) 982.46
- McKernan Law Firm (B.1488–1495, 1500–1501) 617.30
- McKernan Law Firm (B.1488–1495, 1539) 290.65
- McKernan Law Firm (B.1558–1562, 1565–1593) 668.30
- McKernan Law Firm (B.1594–1597) 67.26
- McKernan Law Firm (B.1630–1689) 4,327.87
- McKernan Law Firm (B.1630–1636) 259.05
- McKernan Law Firm (B.1690–1735) 1,529.35
- McKernan Law Firm (B.1736–1783) 2,516.51
- McKernan Law Firm (B.1784–1835) 1,555.16
- McKernan Law Firm (B.1836–1849) 826.76
- McKernan Law Firm (B.1856–1860) 70.91
- Robert H. Schmolke, A.P.L.C. (B.2153–2211, 2898–3354) 2,777.99
- Robert H. Schmolke, A.P.L.C. (B.2153–2211, 2898–3354) 600.00
- Robert H. Schmolke, A.P.L.C. (B.2153–2211, 2898–3354) 2,956.66
- Robert H. Schmolke, A.P.L.C. (B.2212–2283, 2898–3354) 3,656.64
- Robert H. Schmolke, A.P.L.C. (B.2284–2345, 2898–3354) 4,140.18
- Robert H. Schmolke, A.P.L.C. (B.2346–2483, 2898–3354) 6,025.83
- Robert H. Schmolke, A.P.L.C. (B.2484–2536, 2898–3354) 11,782.55
- Robert H. Schmolke, A.P.L.C. (B.2484–2536) 1,885.92
- Robert H. Schmolke, A.P.L.C. (B.2537–2658, 2898–3354) 3,459.07
- Robert H. Schmolke, A.P.L.C. (B.2537–2658) 591.35
- Robert H. Schmolke, A.P.L.C. (B.2659–2783, 2898–3354) 8,061.62
- Robert H. Schmolke, A.P.L.C. (B.2659–2788) 14,036.98
- Robert H. Schmolke, A.P.L.C. (B.2659–2788) 3,118.26
- Robert H. Schmolke, A.P.L.C. (B.2789–2823, 2898–3354) 1,525.62
- Robert H. Schmolke, A.P.L.C. (B.2824–2843, 2898–3354) 2,797.40
- Robert H. Schmolke, A.P.L.C. (B.2824–2843) 1,844.00
- Robert H. Schmolke, A.P.L.C. (B.2844–2897, 2898–3354) 8,665.76
- Robert H. Schmolke, A.P.L.C. (B.2844–2897) 2,592.15
- Talbot, Carmouche & Marcello (B.3457–3481) 1,195.22
- Talbot, Carmouche & Marcello (B.3457–3481) 630.75
- Talbot, Carmouche & Marcello (B.3482–3484) 10.00
- Talbot, Carmouche & Marcello (B.3492–3494) 4.41
- Talbot, Carmouche & Marcello (B.3498–3502) 160.21
- Talbot, Carmouche & Marcello (B.3503–3504, 3506–3521) 142.13
- Talbot, Carmouche & Marcello (B.3505–3521) 197.57
- Talbot, Carmouche & Marcello (B.3522–3572) 240.50
- Talbot, Carmouche & Marcello (B.3522–3572) 6,970.36

- Talbot, Carmouche & Marcello (B.3573–3597) 2,068.64
- Talbot, Carmouche & Marcello (B.3598–3624) 227.35
- Talbot, Carmouche & Marcello (B.3625–3656) 495.66
- Talbot, Carmouche & Marcello (B.3657–3691) 1,882.75
- Talbot, Carmouche . & Marcello (B.3692–3695) 29.54
- Talbot, Carmouche & Marcello (B.3696–3711) 557.75
- Talbot, Carmouche & Marcello (B.3696–3711) 38.07
- Talbot, Carmouche & Marcello (B.3712–3728) 295.65
- Talbot, Carmouche & Marcello (B.3729–3737) 397.95
- Talbot, Carmouche & Marcello (B.3738–3744) 214.78
- Talbot, Carmouche & Marcello (B.3745–3756) 141.90
- Talbot, Carmouche & Marcello (B.3757–3759) 104.03
- Talbot, Carmouche & Marcello (B.3760–3765) 73.91
- Talbot, Carmouche & Marcello (B.3766–3792) 554.27
- Unglesby, Koch & Reynolds (B.3838–3839, 3857–3868) 512.20
- Unglesby, Koch & Reynolds (B.3840–3841, 3857–3868) 302.05
- Unglesby, Koch & Reynolds (B.3873–3893) 500.06
- Unglesby, Koch & Reynolds (B.3894–3917) 941.66
- Unglesby, Koch & Reynolds (B.3918–3919, 3934–3942) 155.00
- Unglesby, Koch & Reynolds (B.3918–3919, 3956–3981) 359.06
- Unglesby, Koch & Reynolds (B.4103–4125) 628.10
- Unglesby, Koch & Reynolds (B.4126–4131) 376.63

TOTAL COSTS FOR MISCELLANEOUS $114,741.67

- ACCOUNTING COSTS TO DATE

The fees for Postlethwaite & Netterville (P & N) are the last expenses on the list of common expenses. Mr. Ralph Stephens from the Postlethwaite & Netterville firm testified that at the time of his appointment, January of 1999, he understood that there would be no refund of the 2.5% money to the non-PSC clients. All of the money was to go for costs and attorney's fees on behalf of the non-PSC clients. (B.133, 153.) Since there was not going to be a return, the accounting firm did not keep separate time records for performing individual work for the PSC attorneys versus common benefit work. The firm had to go back and review the work performed, the checks that were cut and review the time records in order to determine how much work was performed for the common benefit of the group, for the individual attorneys and for the current litigation. (B.133–136.) Based on this review, Mr. Stephens testified that approximately $15,000.00 was solely for the benefit of the GGLG clients and that approximately $80,000.00 was due to the current litigation. (B.148, 154.) It is important to note that the P & N firm was not hired until January of 1999. This means that most of the bills were paid for directly by the individual attorneys. Once the P & N firm was hired, they then had to record and account for the money already spent. They had to obtain all of the supporting documents to verify the checks that had been previously written and enter this information into their accounting system. (B.124–125, 147–148.) Clearly this was for the benefit of all plaintiffs. Although they later paid some individual bills for the attorneys, this was not their primary function and the $15,00.00 spent for this purpose appears to be a reasonable amount in

comparison with the total charged and the fact that they were the accountants from only January, 1999 to approximately November, 1999 when the last settlement was entered. Shortly thereafter,[14] they were involved with discovery in the various suits which were brought by the plaintiffs and the GGLG, and they have been involved with litigation expenses since then.

The firm was also hired by Georgia Gulf to be the escrow agent for them. Mr. Stephens testified that he prepared the disbursement sheets for about 1300 people and wrote the checks to pay them, but the expenses incurred for these functions are not part of this litigation and were not charged in their fees to this group. These duties were performed in relation with their engagement by Georgia Gulf and form no part of the expenses presented at this hearing for reimbursement. (Tr. Pp. 188–201, 225.)

The Court finds that it is also reasonable to charge the litigation expense to the 2.5% fund as this is a necessary expense in order for the Court to approve the costs incurred. It is customary for the Court to appoint a special master in mass tort cases or class actions to account for the money the Court has ordered to be set aside to pay for the common expenses incurred by the court-appointed committee. Mr. Shelby Easterly, III and Mr. Daniel H. Clavier, Jr. both testified at the hearing that they have been appointed numerous times as special masters or as court appointed experts for this very purpose. Mr. Easterly is a Louisiana lawyer with a background in economics (B.22–27), and Mr. Clavier is a certified public accountant with the firm Bourgeois Bennett, LLC in Metairie, La. (B.85–88). Mr. Clavier testified that his fees for working in similar cases is always charged as costs. He further testified that P & N's fees are very reasonable for this type case. (Tr. P. 91.) Since this expense is necessitated by the Court appointing a committee for the common benefit of the group, these expenses will be allowed. Likewise, any additional litigation costs will be approved as for the common benefit.

Accordingly, any additional litigation expenses and the following expenses will be recommended for approval as common benefit expenses:

1. Postlethwaite & Netterville[15] (B.2037–2039) 27,835.75
 - Postlethwaite & Netterville (B.2040–2042) 39,368.88
 - Postlethwaite & Netterville (B.2043–2045) 6,926.40
 - Postlethwaite & Netterville (B.2046–2048) 17,843.17
 - Postlethwaite & Netterville (B.2049–2051) 10,285.50
 - Postlethwaite & Netterville (B.2052–2054) 41,821.98
 - Postlethwaite & Netterville (B.2055–2057) 30,137.00
 - Postlethwaite & Netterville (B.2058) 25,778.98
 - Postlethwaite & Netterville (B.2058-A) 8,927.80
 - Postlethwaite & Netterville (B.2058-B) 17,677.50
 - Postlethwaite & Netterville (B.2058-C) 5,768.71
 - Postlethwaite & Netterville (B.2058-D) 2,045.00

14. Suit was filed by the plaintiffs on February 9, 2000 in the 19th Judicial District Court.

15. Mr. Ralph Stephens testified that the rates used by his firm were the customary and normal hourly rates for this area for accountants with the same level of experience. Directors were paid $200/hr., associate directors $180/hr., managers $125/hr., senior accountants $80/hr., staff accountants $70/hr. and support personnel $60/hr. (Tr. p. 124.)

● Postlethwaite & Netterville (B.2059) 50,000.00

Total Accounting Costs $284,416.67

Reduced by expenses found to be solely for the benefit of the GGLG and their clients $ 15,000.00

TOTAL ACCOUNTING COSTS TO DATE $269,416.67

In summary, the following expenses will be recommended for approval as common benefit expenses:

● TOTAL EXPERTS AND RELATED COSTS $280,283.82

● TOTAL MEDICAL COSTS $418,313.07

● TOTAL TRAVEL & RELATED COSTS $110,763.76

● TOTAL COURT REPORTING COSTS $ 52,887.33

● TOTAL COSTS FOR NURSES $ 44,552.67

VI. TOTAL INVESTIGATIVE EXPENSES $ 35,499.27

VII. TOTAL COURT COSTS $ 17,043.34

● TOTAL COST FOR COPIES $149,185.62

● COSTS OF THE MINI WAREHOUSES $ 12,240.00

● TOTAL COST FOR POSTAGE $ 14,926.20

● TOTAL COST FOR MILEAGE AND PARKING $ 1,972.55

● TOTAL COSTS FOR MISCELLANEOUS $114,741.67

● TOTAL ACCOUNTING COSTS TO DATE $269,416.67

LISTED COMMON BENEFIT EXPENSES $1,521,825.97

All of the above costs were listed on the Common Expense Schedule (PSC Exh. 1), however, they were not separated into litigation, administration and distribution costs. In order to compare these expenses with the costs incurred in similar cases, some separation will be needed and this will be handled in the Summation.

● ASSOCIATE ATTORNEY EXPENSE

There is only one associate attorney whose time is being claimed as a common expense, although many other associates worked on the case. (Tr. Pp. 543–544, 567.) Ms. Owen's time is being charged to the group as she worked for everyone in the group, not just Mr. Schmolke, and her work benefitted all plaintiffs in this matter, both PSC clients and non-PSC clients.

Ms. Adele Owen began working for Mr. Schmolke in 1991 when she graduated from law school and has been with him ever since. (Tr. P. 310.) Again, no time records were kept so, her time is estimated. She testified that the firm became involved in the case in October of 1996, however she did not charge any time for 1996 as she could not give a reliable estimate of her time during this period. She testified that during this time she was involved in other cases as well as this matter. It was not until around the middle of 1997 that she began working on this matter almost full time. (Tr. Pp. 311–312.) She estimated that she worked 33 weeks in 1997 on this project for six days a week for 12 hours a day. During 1998 she worked full time on this matter, only occasionally participating in other work, and worked six days a week for 12 hours a day. She would arrive at work at around 7:00 a.m. and leave at about seven or eight at night, taking work with her to complete at home. Approximately 99% of her time was spent on this case up until around November of 1999. (Tr. Pp. 313–314.)

On May 14, 1997, the attorney for Georgia Gulf had delivered between 6,000 and 8,000 pages of documents in response to a request for document production. This delivery was made around 4:45 p.m. on the evening before Mr. Schmolke was to take a deposition. In order to prepare Mr.

Schmolke for the deposition, Ms. Owen had to take the documents home with her, read as many of them as she could and report their content to Mr. Schmolke the next morning in time to get to the deposition. In all, she worked about 22 hours that day, making it to the deposition at nine o'clock the next morning. This was not the only night she spent reviewing documents for depositions the next day. (Tr. P. 315.)

In 1997 she took one week off for Christmas. In 1998 she took two days off to attend a CLE program and stayed one extra day in New York City after one of the expert's depositions. In 1999, she attended another CLE program for two days. (Tr. P. 316.) These were the only days she did not work during these years.

At the hearing, Mr. Rastanis introduced several pleadings and letters which were allowed in as impeachment evidence. After reviewing the transcript however, it is apparent that Ms. Owen testified that she did not think she originated any new cases during this time, but she was not sure. (Tr. P. 374.) Further, when questioned by Mr. Zimmerman, he asked when she began spending 99% of her time on the Georgia Gulf litigation, not when she began to spend 100% of her time on the case. Her response was in the middle of 1997 (Tr. P. 313), and at that time she gradually began turning over her case load to Mr. Steve Lemoine in her office. (Tr. P. 316.) POI 1 involves a suit that was filed on January 20, 1998 signed by Ms. Owen with discovery requests attached, also signed by Ms. Owen. By August, 1998, however, Mr. Steven Lemoine was filing the judgment in the case. Mr. Lemoine is with the Schmolke law firm and he testified that after this suit was filed, he took over discovery, site visits, mediation and finally settlement of the file. Ms. Owen handled the initial visit with the client, initiated the factual investigation, filed the suit and

wrote one brief in it. Further, he took over 99–100% of her cases after that. (Tr. Pp. 687–689.)

POI 2–4 involve suits filed with the Clerk of Court for the 18th Judicial District, however, Ms. Owen rarely signed anything in the file once the suit was filed. Mr. Lemoine testified that he took these cases over as well. (Tr. Pp. 689–694.) The letters identified as POI 6–9 were all signed by someone other than Ms. Owen even though her name appears on the letter and she testified that her secretary wrote and signed the letters, not her. (Tr. Pp. 439–443.) POI 7–9 were all written during July of 1998 and POI 6 was written in October of 1997. These exhibits are not inconsistent with her testimony.

Some of the work she performed is described in Section VIII above regarding the cost of copies and will not be repeated in total in this section. It was pointed out however, that there were 41 volumes of main pleadings filed in this matter. In 1996, approximately 59 pleadings were filed and Ms. Owen either drafted or helped draft 14 of them. Likewise in 1997, 414 pleadings were filed and Ms. Owen drafted or helped draft 51 of them. In 1998, 800 pleadings were filed and in 1999, 627 were filed. Ms. Owen drafted or helped draft 102 in 1998 and 55 in 1999. Further, regarding discovery pleadings, she drafted or helped draft 4 out of the approximate 51–73 discovery requests prepared. (PSC Exh. 15, Tr. Pp. 318–319.) As the pleadings were filed, she would read all of them and determine if service needed to be made and then index them. If service needed to be made, she would then direct the staff to make the copies and serve them on the appropriate parties. She also directed the service of any court documents that were forwarded to the Schmolke law firm for dissemination. (Tr. P. 320.)

She performed legal research over the years, writing briefs to be submitted to the court or interoffice memos for their own use or to be discussed with non-PSC attorneys. The type of research she performed was varied. She testified she performed the following type of research:

A Insurance, workers' compensation, especially with reference to intentional tort, intentional acts, statutory employee. We did a lot—I did a lot of research on the Hazardous Waste Control Act, as that became more important later on down the line, expert issues, going towards, ultimately, Dalbert (phonetic) hearings and what have you on our experts and the defendants' experts, environmental issues, chemical exposure.

I did quantum research on all the injuries, the symptoms, the treatment times, all those things on the medical end of it. I'm sure there are others. I can't think of them off the top of my head.

(Tr. P. 322.)

In connection with document production from the defendants, Ms. Owen testified that she reviewed approximately 465,000 documents, some she reviewed with the experts, and determined to get copies of only 365,000. (Tr. P. 324.) PSC Exh. 14 is a list of all the document productions by the defendants, giving the dates of the production and the number of pages produced. These documents were reviewed by Ms. Owen many times, indexed and extracted into subject notebooks, as indicated in the copies section of this report. (Tr. Pp. 325–328.)

She also was responsible for disseminating the discovery requests propounded by the defendants. Since Mr. Schmolke was liaison counsel, the office received 3100 sets of discovery requests in one day. The requests were delivered by truck and placed up and down the hallways in the office. She had to contact all of the other attorneys and make arrangements for them to get these requests. (Tr. Pp. 330–332.)

As the discovery material was answered and returned to her office, the paralegals would enter the information into the computer and Ms. Owen would receive a copy of it. The material consisted of about 125 to 140 questions per plaintiff and the Schmolke firm represented about 412 workers and 1500–1800 collaterals. (Tr. Pp. 409, 416, 436.) Ms. Owen testified:

What I did on the discovery responses for our clients, the paralegals would put the information together in the computer, I would get a draft of that printout and I would review those responses for completeness, accuracy, did it answer the question, do I need to send it back to the paralegals for—there might be an answer that was just, made no sense to me, might have been answered to the wrong question, those kind of things— and I would review those, send them back to the paralegals, get it corrected and then I would sign off on the responses for the files that were handled out of my office.

(Tr. P. 438.) She reviewed these responses between the times she was involved in depositions in New Orleans for LIG and Amoco. This was between June and August of 1998. (Tr. P. 452.)

Ms. Owen also helped locate and hire some of the experts involved in this matter. She worked with the investigators, other attorneys in this matter and performed independent research on the experts in order to find and engage them. (Tr. Pp. 332–334.) After they were hired, she worked closely with several of them going through the document production, obtaining additional information from them, discussing various theories of liability with them and helped with their expert reports. (Tr. Pp. 334–336.) She then worked with them regarding the defen-

dants' experts. She conducted investigations on each of the defendants' experts, obtaining copies of prior work they had performed or having the PSC experts obtain information about them, using the Internet or other professional organizations to obtain the information. (Tr. Pp. 337–338.) Prior to Mr. Schmolke taking the experts' depositions, she read all of this information, approximately another 10,000 pages of information, talked with the PSC experts about it and informed Mr. Schmolke of this information. (Tr. Pp. 339–340.) There were 82 liability depositions taken in this matter. (PSC Exh. 12.) For each deposition that Mr. Schmolke took, Ms. Owen would gather the above information, gather all pertinent documents from the originals, talk with the PSC experts and Mr. Schmolke, go to the deposition and assist Mr. Schmolke and then inform the other attorneys, PSC and non-PSC of the results. After reviewing the times indicated on the deposition covers, PSC Exh. 13, it appears that approximately 457.5 hours were spent taking depositions and Ms. Owen attended for approximately 331.5 of these hours. She testified that she attended 58 of these depositions although she is not listed in three of them. (Tr. Pp. 342–344.) This, of course, does not include the travel time and preparation time involved prior to and after taking the depositions. She also prepared outlines for most of the depositions taken, some of them running 10–12 pages in length. (Tr. P. 345.) Non PSC attorneys would call her and inquire about how the depositions went or ask her to send them some documents or other information regarding the depositions. (Tr. Pp. 347–348.)

The PSC experts were also deposed. She worked with the experts to prepare them for their depositions. Jack Vermillion, the hydroblasting expert, came to Baton Rouge on a Sunday and she had six or eight of the clients come and talk with him about their work at the plant. Later during the day, several of the attorneys came to review the expert's report with him and discuss his testimony. Although she did not charge any time for Sundays in her estimate of her time, she often worked on Sundays or any time that was needed. This was the way most of the experts' depositions were handled. (Tr. Pp. 348–349.)

As the case progressed, Ms. Owen would prepare agendas for meetings between the PSC attorneys in order to coordinate their efforts. The meetings were lengthy and covered discovery issues, pre-trial issues, medical, liability, etc., anything that was necessary to the case. These meetings were necessary in order for everyone to stay on track and get instructions on what they needed to do. (Tr. P. 350.)

Then there were monthly meetings with the court and hearings on different issues. She normally did not argue in court, but attended almost all of the hearings. Towards the end of 1998 there were two to three meetings with the court a month in order to determine how the bellwether plaintiffs were going to be selected and how the liability issues were going to carry over. Trying to make the presentation of the evidence to a jury as simple as possible was another matter she worked on. Presenting the chemical and engineering principles involved was going to be difficult and she wanted to make it as understandable as possible. (Tr. Pp. 350–353.)

She was responsible for the day-to-day management of the case and coordinated the paralegals' activities, even those in other law firms. She had meetings with them and assigned different tasks to each group. She basically coordinated all of the activity of the group, answered questions from the attorneys, paralegals, accountants, experts and the defendants. She received fifteen to thirty calls each day, maintained 70

correspondence files containing approximately 35,500 pages of correspondence, maintained all of the discovery material, the experts' documents, the medical documents and summaries, investigative files and files on each defendant. She had to be knowledgeable on the number and types of injuries and symptoms of the plaintiffs in order to help the non-PSC attorneys, the experts, the plaintiffs and the doctors. She obtained about 200 medical articles and 20 books on problems she felt were pertinent and reviewed about 175 of the articles. (Tr. Pp. 354–364.) She was then involved with settlement negotiations.

Settlement negotiations started in about January of 1999 and most of the claims settled by October of 1999. There were probably about 15 meetings during this time. The language of the settlements had to be negotiated and passed around for comments and corrections to all plaintiffs' counsel. (Tr. Pp. 364, 401–403.) On April 16, 1999, Mr. Jim Ryan made an announcement in Court on behalf of the PSC that most of the cases had settled in principle. (Exh. PO 2.) But, he added, "[O]ne thing I want to make real clear to the court; it is an agreement in principle, that this agreement was reached as of late—okay?—and we have to go back to respective clients and obtain final authority, which we have agreed to use our best efforts and good faith to do." (Exh. PO 2, p. 4–5.) Further, Mr. Lambert stated that they all had to go back to their clients and get approval and, the defendants had to get final blessings as far as their interests were concerned. He also stated that there were some cross claims that had to be discussed, so it was just an agreement in principle. (Exh. PO2, Pp. 5–6.)

Ms. Owen testified that the PSC had to negotiate with the defendants regarding broad categories of injuries and their causation. The defendants would argue that a particular type of injury would not be caused by the release and the PSC had to support the causation in order to get money for that injury. Negotiations were not for each individual plaintiff, they were for types of injuries and the negotiations were on-going. These negotiations were beneficial to all plaintiffs as once a higher standard was set for a particular type of injury, the non-PSC clients did not have to argue causation; they benefitted from the prior arguments. (Tr. Pp. 406–426.) How the individual plaintiffs' claims were finally settled with the plaintiffs is not part of this hearing and no findings on this issue will be made.

Other testimony verified the work Ms. Owen performed. Mr. Ralph Stephens, the accountant, testified that he called either Ms. Owen or Mike Clegg if he had a question regarding the expenses. (Tr. Pp. 148, 158.) Mr. Joseph J. McKernan testified that Ms. Owen was a "walking encyclopedia" about the case and that she had great "command of the case." (Tr. P. 541.) Mr. Michael Clegg testified:

A I don't think there's anything she didn't do. In my opinion, Adele Owen was the most important cog in this wheel in this case. Bob Schmolke had a very important role, Mr. Lewis Unglesby had a very important role, but, in my opinion, this case could not have been resolved in the time and on the fast track that it was done to the benefit of all plaintiffs without the work of Adele Owen. There was no time that I didn't call her and ask her for a document, what was said in a conference, what was said in a deposition that within 24 hours—it shocked me sometimes—that she would have it back to me quicker than I'd forgot I asked for it.

(Tr. P. 624.) He also confirmed the amount of time she spent at the office as she was always there when he called her

early in the morning or late at night and any time he went to Mr. Schmolke's office, her car was there. (Tr. Pp. 624–625.) Mr. Lemoine also testified that she was always the first one in the office and the last one to leave and was there on week-ends and took work home with her after a full day of work. (Tr. Pp. 695–696.) Mr. Schmolke confirmed the role Ms. Owen took on in this matter. She basically took over as liaison counsel as he became the lead counsel on the issue of liability. (Tr. Pp. 705–721.) He added that she was responsible for working with the liability experts to make sure that their reports got out on time. She worked with them on a daily basis as, in accordance with the court's order of November 3, 1997, they were supposed to name their experts by December 31 and have their reports out by about January 15, 1998. They were able to do this only with the help of Ms. Owen. (Tr. Pp. 720–721.) He also added that she coordinated all court dates with the other attorneys as the Judge wanted Mr. Schmolke to represent the PSC in court so he had to be there every time a court appearance was necessary. She coordinated the dates and times with the attorneys and the court (Tr. Pp. 718–719), and she also coordinated the dates and times for depositions (Tr. P. 714).

The fact that they had from November 1997 to January 1998 to identify their experts and get their reports out certainly supports the amount of time Ms. Owen claims for the later part of 1997. Sections I and II of this report set out some of the work that was involved in working with the experts. Ms. Owen explained the details of her workings with the experts as reviewing document production, obtaining additional information from the experts, discussing theories of recovery, excluding those they could not support, preparing them for their depositions, and the PSC experts would research and discuss the defendants' experts with Ms. Owen and

Mr. Schmolke and prepare them for these experts' depositions, etc. (Tr. Pp. 334–340.) But, most importantly, she had to learn the processes involved and the chemistry behind it so she could perform her duties and assist the experts. (Tr. P. 429.)

The nurses had started their interviews in August of 1997 (B.3370) and Ms. Owen was reviewing and recording this completed data as well. Exhibit PSC 14 shows that the documents started rolling in on May 14, 1997, with additional productions every month thereafter. These documents had to be read and categorized and were studied many times. (Tr. P. 325.) Exhibit PSC 12 shows that liability depositions started on May 15, 1997 and continued on May 16, July 28, 29, 30, 31, August 1, 26, 28, September 3, 4, 5, October 14, 15, 1997. Section VIII explains some of what was involved in preparing for these depositions. In 1997, 414 pleadings were filed and Ms. Owen drafted or help draft 51 of them. There are only 52 weeks in a year and Ms. Owen testified that she did not turn over her other cases to Mr. Lemoine until the middle of 1997. Considering that she did not submit any time for 1996, nor the first part of 1997, this is a reasonable amount of time to credit her with. Accordingly, it will be recommended that Ms. Owen's time be approved as requested for the year 1997.

For 1998, documents were produced at least once every month, except for February, August and November. (Exh. PSC 14) Ms. Owen drafted or assisted in drafting 102 pleadings (Exh. PSC 15), discovery by the defendants began, taking each of the plaintiff's deposition over a very short period of time, running seven to eight depositions at a time, and all of the plaintiffs' discovery material had to be submitted to the defendants. Mr. Donald T. Carmouche testified that he was primarily responsible for maintaining the symptoma-

tology records and making certain that all of the plaintiffs had been screened medically and that he worked closely with Ms. Owen on this as she organized his staff to perform this work. They probably met weekly and also discussed the overall testimony of the medical doctors and coordinated meetings with them and the other experts. (Tr. Pp. 835–836.) She also prepared for and attended 34 liability expert depositions during 1998. Considering the above and all of the work set out in the other sections of this report, it will be recommended that no reduction be made to the time claimed by Ms. Owen during 1998.

In 1999, Ms. Owen reduced her work day to eight hours a day for only five days a week. She also claims to have worked steadily on this case only 48 weeks out of the year. The testimony was that settlement negotiations started in January of 1999 and most of the cases had settled by October of 1999. During this time there were approximately 15 meetings with the defendants to discuss the settlement terms. In May of 1999 the Memorandum Of Understanding was signed and all plaintiffs' counsel started trying to negotiate individual settlements with the plaintiffs. Ms. Owen was still trying to work out issues like the workers' compensation, the medical causation for certain types of injuries and providing for medical monitoring. (Tr. Pp. 401–417.) Mr. Schmolke also testified as to the work which was being completed in 1999. He stated that only about 30 to 40 people settled in March of 1999 and what the defendants were willing to do for 30 to 40 people was different from what they were willing to do for 500 plus people, so they had to work hard to get what they wanted for the rest of the people. (Tr. Pp. 738–748.) Ms. Owen testified that by the PSC fighting these battles, the non-PSC attorneys did not have to fight these battles and they benefitted from the improved position of the plaintiffs

brought about by the work of the PSC attorneys. (Tr. Pp. 417–420.)

Mr. Rastanis spent a great deal of time reviewing the activities of counsel after April, 1999 when the parties announced the settlements in Court. (Tr. Pp. 404–426.) However, when the District Judge entered an order of dismissal on April 20, 1999, giving the parties 120 days to reopen the action if the settlement was not consummated, this was not the end of the case. This deadline was extended many times. The Memorandum of Understanding was signed in May of 1999 and set forth the understanding of the parties as to what had to happen in order to consummate a settlement—it did not settle all of the cases on that day. (Exh. A 9, under seal.) Opposing counsel argues that no other activity was needed after this point except to effect the settlement, therefore, none of the expenses after this point should be for the common benefit.

A review of the record in this matter shows that motions to extend the 120 days to consummate the settlement, or to just re-open the cases, were filed on July 28, 1999, August 13 & 16, 1999, September 13 & 15, 1999, October 12, 1999, November 12, 15 & 16, 1999 and December 12, 21 & 29, 1999. This does not indicate that all of these cases settled in April of 1999. Further, from the testimony at the April 1999 hearing, it is apparent that there was other work to be performed prior to completing the settlements. (Exh. PO 2, and Exh. A–9, under seal.)

In 1990, the Fifth Circuit Court of Appeals vacated a judgement of a district court when the district judge awarded all of the hours claimed by an attorney to be reasonably spent on that case, instead of reducing the amount of hours since the attorney did not keep contemporaneous time records. This was before the January 1, 1983 amendment to Local Rule

47.8.1 requiring contemporaneous time records, however the Court stated:

> ..., the acceptance in toto of Oitzinger's claim of 6,652 hours by the district court when almost 70% of the hours claimed were based upon reconstructed time records casts doubt on the district court's decision that all of the hours claimed by Oitzinger were reasonably expended on the litigation.

*Alberti v. Klevenhagen*, 896 F.2d 927, 931 (5th Cir.1990). The Court of Appeals sent the matter back to the district judge for specific findings that particular hours claimed were reasonably expended on the litigation.

In this case, there were no contemporaneous time records and review of the testimony setting forth the work performed does not support the amount of hours claimed to have been spent for the benefit of the group during 1999. The work performed during 1996, 1997 and 1998 are supported by the evidence, however, there was too much work to be done for the benefit of the GGLG clients in obtaining the individual settlements to charge all of the time claimed to the group. The Court does find that some of the time devoted to individual settlements was beneficial to the group and all of the negotiations with the defendants benefitted all plaintiffs as they were able to set a standard for all those settling after the GGLG clients settled. The Court will reduce the hours for 1999 by 20% to reflect the lack of time records and the nature of the work being performed during this time.

Therefore, the following hours will be recommended for approval as being for the common benefit of the group:

- 1997 33 wks. × 6 days × 12 hrs. = 2376 hrs. × $150/hr [16] = $ 356,-400.00
- 1998 52 wks. × 6 days × 12 hrs. = 3744 hrs. × $150/hr. = 561,600.00
- 1999 48 wks. × 5 days × 8 hrs. = 1920 hrs. × 20% = 384 hrs.

1920 hrs.—384 hrs. = 1536 hrs. × $150/hr. = 230,400.00

TOTAL COSTS FOR ASSOCIATE ATTORNEY $1,148,400.00

● PARALEGALS AND OVERTIME EXPENSE

Mr. Ralph Stephens of P & N testified that PSC Exh. 10, Schedule E shows only 60% of the time paralegals worked on this case as they performed some functions which were solely for the benefit of the PSC clients and they decided to reduce the overall time by 40% to reflect this individual work. They then charged the non-PSC clients with only 31.8904031% of this 60% in order to account for their portion of the common benefit. (Tr. Pp. 174–178, PSC Exh. 8.) This is the same percentage used in allocating copy costs, etc. and is based on the pro rata share of settlements each group received. The division of expenses using this percentage has already been accepted by the Court as the most sound method of allocation under the circumstances of this case and will be accepted here. Since the accumulation of the medical data has already been found to be of great benefit to all plaintiffs, the work the paralegals and the temporary employees performed collecting this data will also be approved as a benefit to the group. Handling the mail outs and making the copies and entering the data collected were all for

---

**16.** The Court finds that *$150/hr.* is in accord with the prevailing market rates in the community. Mr. Ralph Stephens testified that this rate was approved in *In Re: Ingram Barge Co.*, C.A. 97–226 (M.D.La.); Mr. Shelby Easterly, III, expert in the filed of costs, testified that associate attorneys' fees range from $125–$175/hr. (Tr. p. 54.) See, *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541,1545, 79 L.Ed.2d 891 FN 9, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984).

the benefit of the group and the Court will recommend that their work, as reduced, be approved as set forth below.

The underlying documents have been checked for references to the Georgia Gulf litigation, or other identifying references and most of the documents contain such references. One area of concern was the time submitted for Mrs. Maxine Muller. Mrs. Muller worked for the McKernan law firm, but Mr. McKernan did not remember who she was or who she worked for. (Tr. Pp. 547–548.) Mr. Michael Clegg of the McKernan office testified that Jean Ann Larose was hired solely to work on the Georgia Gulf litigation and his paralegal/secretary, Andrea Earhart, worked on the case 95% of the time. The only part of Ms. Earhart's salary which was charged to the group was her overtime. (Tr. P. 554.) He also remembered a girl named Jackie and one named Lee, but he did not remember Maxine Muller. (Tr. Pp. 619, 628.) Ms. Muller testified at the hearing and stated that she did not work on the Georgia Gulf case, she was working on the Bogalusa plant explosion case. (Tr. P. 893.) Out of the $285,381.22 charged for overtime and temporary employees, only $752.50 was for Ms. Muller. (B.4384, 4390, 4391.) This amount will be disallowed.

The following charges will be recommended for approval as being for the common benefit of the group:

- PSC Exh. 5 (Sch.B.) Overtime–Temporary employees $285,381.22
- Less amount charged for paralegals in PSC Exh. 5 (229,690.57)
- Total Overtime–Temporary employees $ 55,690.65
- Plus PSC Exh.10 (Sch.E) 60% of the Paralegals' time 999,154.80

Total Overtime, Temporary Employees and Paralegals' time $1,054,845.40

Less hours claimed for Maxine Muller $ 752.50

TOTAL OVERTIME, TEMPORARY EMPLOYEES' AND PARALEGALS' TIME $1,054,092.90

The amount which was to be charged to the non-PSC clients is only 31.8904031% of this 60%, before the above reduction, which would have been $1,054,845.40 × .318904031 = $336,394.41. PSC Exh. 7 shows only that part which was to be charged to the non-PSC clients prior to the reduction and will have to be adjusted, but is shown here for comparison purposes. This exhibit shows:

Overtime & · Temp Employees (per Schedule B) $(91,009.22)

Paralegal time @ $60 per hour[17] per Schedule E (318,634.49)

Paralegal Credit for amounts included in Schedule B 73,249.25

Total Overtime, Temporary employees and paralegals' time $336,394.46

● BANK INTEREST EXPENSE

 PSC Exhibits 3 and 9 concern the interest paid to the bank on the line of credit used to finance this case. The first line of credit was established on April 24, 1997 with City National Bank (PSC Exh. 19), and was signed by Messrs. Schmolke, Unglesby, Carmouche, McKernan and Clegg. The second one was executed on January 5, 1998 and increased the amount of the line of credit. (PSC Exh. 19.) The third one was with Bank One and substantially increased the credit line. This one was entered into on July 9, 1999 and was paid out in November of 1999. (PSC Exh. 19.) The Plaintiffs' Steering Committee

---

**17.** Mr. Shelby Easterly testified that $50–$75 per hour were customary for this area (Tr. p. 54.), and Mr. Ralph Stephens testified that this rate was approved in *In Re: Ingram Barge Co.*, C.A. 97–226 (M.D.La.) (Tr. p. 177–178).

had been appointed by the state court on March 25, 1997. Since all five members of the GGLG executed the document, there is no question that it was taken out for the use in these proceedings. The necessity for the expenses incurred during 1996, 1997 and 1998 have been set out in detail above and will not be recited here.

The only problem is with 1999. Ms. Owen, Mr. Schmolke and Mr. Carmouche all testified as to the activities taking place during 1999, and this work was for the common benefit. However, the GGLG did not prove that the work they described would require a large amount of capital to finance these activities. The work that would require financing this late in the game would be obtaining the individual settlements and disbursing the settlement money. The largest amount of interest was incurred in June of 1999, with substantial amounts being incurred in July, August and November when the line of credit was finally paid out. Since the associate attorney's time was reduced by 20% for 1999, the investigative services were reduced by the amount it took to find individual plaintiffs, the accountants' fees were reduced and the paralegals' time was reduced by 40% overall, only half of the interest expense for 1999 will be recommended for approval in order to reflect the individual benefit of the expenses to the GGLG clients.

Accordingly, the following amounts of interest expense will be recommended for approval as common benefit costs:

- 1997, Exh. 3, B. 4151–4152, 4153–4154, 4163–4165, 4166–4168 $ 8,252.23
- 1998, Exh. 3, B. 4138–4139, 4155–4156, 4157–4158, 4159–4160, 4161–4162, 4166–4168 $ 81,033.26
- 1999, Exh. 3, B. 4140–4152 ($102,464.21 ÷ 2) $ 51,232.11

TOTAL INTEREST EXPENSE $140,517.60

LISTED COMMON BENEFIT EXPENSES $1,521,825.97

TOTAL COSTS FOR ASSOCIATE ATTORNEY $1,148,400.00

TOTAL OVERTIME, TEMPORARY EMPLOYEES' AND PARALEGALS' TIME $1,054,092.90

TOTAL INTEREST EXPENSE $ 140,517.60

TOTAL COMMON BENEFIT EXPENSES $3,864,836.47

### ● SUMMATION

 As stated at the beginning of this report, since the attorneys relied on the 2.5% agreement which was approved by the state court and were no longer required to keep contemporaneous records, this Court determined to receive the reconstructed evidence of the costs incurred over the past four to five years and, in the event the proven costs were relatively close to the 2.5% amount, or higher, the Court would approve the 2.5% as being reasonable under the circumstances without approving a certain dollar amount. In the event the proven costs were substantially less than the 2.5% amount, then the Court would have to approve a certain dollar amount.

The $3.8 million dollars recommended for approval as common benefit expenses is more than the $3.5 million withheld from the settlements. (PSC Exh. 7.) If the Court were to consider expenses for food and air travel and other expenses that could have been claimed, and subtracted the additional expenses that were shown to have been incorrectly charged to the common expenses, the difference would be minimal and unproductive. The bottom line is that expenses were more than the 2.5% charged in this matter. The Court must now determine whether the 2.5% is a reasonable amount for costs in this matter.

Mr. A. Shelby Easterly, III was accepted by the Court as an expert in the field of litigation, administrative and distribution costs in mass tort actions. (Tr. Pp. 27 & 33.) In accordance with the Court's categories of expenses, Mr. Easterly testified as to his understanding of the nature of these categories:

Litigation costs are the costs that any attorney will have in any one plaintiff, one defendant lawsuit: Court costs, deposition costs, expert witnesses, postage, milage, travel to take depositions, all of these items that we see in cases that we litigate day in and day out.

The administrative costs are those costs which, because of the mass tort nature of the case, are additional costs incurred that we don't see in normal cases. This includes the cost of liaison counsel for providing copies of all documents and notices to all of the counsel that are involved in the case, document repositories, additional staff made necessary by the complex nature of the litigation and matters of that sort.

In distribution costs, we have categorized, generally, the costs incurred in administering a fund and accounting for such a fund, either from settlement or a judgment. These costs include, generally, accountants, special master, court-appointed experts and other costs for those things.

(Tr. P. 26.) These definitions are in accord with those defined in *In Re Combustion Inc.*, 968 F.Supp. 1116, 1130 (W.D.La. 1997), and those used by the Court in this matter.

In accordance with these definitions, the expenses associated with the liability and medical experts, travel, court reporting, nurses, investigative expenses, court costs, mileage and parking are litigation expenses. The troublesome areas are the costs for postage, copying, and the miscellaneous category. The miscellaneous category includes all of the expenses paid prior to P & N taking over the account and include all types of charges.

The additional copies and mailings made due to the appointment of the PSC would appear to be administrative expenses, however part of the expenses are also litigation expenses which would have occurred in any litigation. These would include the expenses of the copies made of the documents for taking depositions, sharing the information obtained with the experts to help prove causation and preparing for trial, etc. These expenses will be divided in half and charged one-half to litigation expenses and one-half to administration for comparison purposes.

The accountants' fees in this case were for administering the common fund, paying common expenses and reporting to the Court. Additional fees have been incurred for the cost hearing and these expenses should be considered for the benefit of all. P & N's services would be classified as distribution costs.

Accordingly, the total litigation expenses incurred in this matter are as follows:

- Liability and medical experts, travel, court reporters, nurses, investigative services, court costs, mileage & parking $ 961,315.77
- Half of the costs of copies 74,592.81
- Half of the costs of postage 7,463.10
- Half of the costs of miscellaneous expenses 57,370.84

TOTAL LITIGATION COSTS $1,100,742.52

The total administrative expenses incurred in this matter are as follows:

- Mini warehouse $ 12,240.00
- Overtime and paralegal expenses 1,054,092.90
- Associate Attorney's expenses 1,148,-400.00
- Interest expense 140,517.60

- Half of the costs of copies 74,592.81
- Half of the costs of postage 7,463.10
- Half of the costs of miscellaneous expenses 57,370.84

TOTAL ADMINISTRATIVE COSTS $2,494,677.25

The total distribution costs to date are as follows:

Postlethwaite & Netterville $ 269,416.67

TOTAL DISTRIBUTION COSTS $ 269,-416.67

Expressed as a percentage of the total settlement amount, litigation expenses are 1%, administrative expenses are 2% and distribution costs are $269,416.67, or .1% of the settlement amount. Thus, actual expenses were approximately 3.1% of the settlement amount and only 2.5% was retained. This is well below the percentages of costs in similar cases as expressed by the testimony of the cost experts accepted by the Court at the hearing.

Mr. Shelby Easterly testified regarding the rates of the various costs in other cases he either served in as special master, court appointed expert or as defense co-counsel. (PSC Exh. 24.) In serving in these capacities, Mr. Easterly researched prior precedent and reported decisions and has continued to follow the awards made in mass torts cases. (Tr. P. 25.) Some of these cases were class actions, but the major differences in expenditures would be the costs of distribution and administrative costs, and, of course, the Court awards an amount for attorneys' fees in class actions. The distribution and administrative costs would probably be higher in a class action due to the notices to the class, settlement approval hearings and final distribution. Even though, the rates awarded in those cases are still valuable for comparison purposes. In the present case, no settlement approval hearing was held and the costs for settlement distribution to the individual plaintiffs was not charged, however the hearing on costs approval will off-set the expenses incurred in a class action. Further, since the 2.5% is as low as it is, a thorough analysis of each of the cases relied on by the experts will not be undertaken. Both experts testified that they were not aware of any case with expenses as low as 2.5%, so the reported cases are the only ones we have for comparison. (Tr. Pp. 69, 107.)

Mr. Rastanis cited one case he was familiar with that came in under 2.5% for costs. *Shaw v. Toshiba America Information Systems, Inc.*, 91 F.Supp.2d 942 (E.D.Tx.2000). In that case, however, suit was filed on March 5, 1999 and was settled on or about October, 1999, less than one year after suit was filed. In the present case, costs were being incurred from 1996 through 1999 and distribution costs are still being incurred.

Mr. Easterly testified that in the Thompson Hayward case [18] litigation costs were 6%, administrative costs were 9% and distribution costs were $500,000 plus interest. That litigation continued from the late 1980's until 1996. (Tr. P.36.) He also stated that the percentages he was testifying about were final percentages, not just the amounts assessed, or reserved. (Tr. P. 39.) Other cases he was involved with were as follows:

| CASE NAME | LITIGATION COSTS | ADMINISTRATIVE COSTS | DISTRIBUTION | DURATION OF CASE |
| --- | --- | --- | --- | --- |
| Thompson–Hayward [19] | | | | |

18. *Gracie s. Atkins, et al v. Harcross Chemicals, Inc.*, et al, No. 89–2376 c/w 90–7562, 90–7563, 90–8911, 90–8414 and 90–0283, Civil District Court of Orleans Parish, La.

19. *Gracie S. Atkins, et al v. Harcross Chemicals, Inc., et al*, No. 89–23976 c/w 90–7562, 90–7563, 90–8911, 90–8414, and 90–0283,

| | | | | |
|---|---|---|---|---|
| Pp. 35–36 of Vol. I | 6% | 9% of gross | $500,000 [20] | Late 80s until 1996 |
| Ford v. Elsbury [21]<br>Pp. 37–38 of Vol. I | 6% | 5.75% | $500,000 [22] | 4½ years |
| Koch Nitrogen [23]<br>Pp. 38–39 of Vol. I | 2% | 5% | $500,000 [24] | Lasted 4 to 5 years |
| Johnson v. Great Southern Oil [25]<br><br>Pp. 39–40 of Vol. I | 10% collectively | 10% collectively | $325,000 [26] | Not given |
| New Orleans Tank Car Fire Leakage Litigation [27]<br><br>Pp. 40–42 of Vol. I | 4% of the recovery | 4% of the recovery | $1 million plus [28] | 1987–1999 preliminary settlements reached |
| Combustion [29]<br>Pp. 42–43 of Vol. I | 6% | 6% | $500,000 [30] | Not given |
| Lincoln Creosote [31] | 9.6% | 9.6% | $581,537 [32] | 1989–1999 |

Civil District Court of Orleans Parish, Louisiana. Settlement amount $51,750,000.

20. Plus interest recovered on qualified settlement fund.

21. *Undray D. Ford, et al v. Ernie Elsbury, et al* No. 92–4154 and *William Smith, et al v. Ernie Elsbury, et al*, No. 93–3746 and *Marie Oliva Aaron, et al v. Ernie Elsbury, et al*, No. 95–6171, Fourteenth Judicial District Court, Calcasieu Parish, Louisiana. Settlement amount $50 million.

22. Plus interest accrued on settlement fund.

23. *Morris Laiche, et al v. Koch Industries, Inc.*, No. 44,840 c/w All Other Cases, Twenty Ninth Judicial District Court, St. Charles Parish, Louisiana.. Settlement amount approximately $35 million..

24. Plus interest accrued on settlement fund.

25. *Ernest Johnson, et al v. Great Southern Oil & Gas Co., Inc., et al*, No. 38,144, Twenty Fifth Judicial District Court, Plaquemine Parish, Louisiana. Settlement amount $6.5 million.

26. Litigation and administrative costs were assessed collectively at 10% of gross of settlement. Distribution costs were $325,000 plus accrued interest and administrative and litigation costs were approved at $650,000, due to lack of money, but exceeded $1 million.

27. *In Re: New Orleans Train Car Leakage Fire Litigation*, No. 87–16374 And All Related Cases, Civil District Court, Orleans Parish, Louisiana.

28. Total litigation costs and administrative costs were 8% of the $215 million partial settlement recoveries.

29. *In Re: Combustion, Inc.* Litigation, No. 50,212, Twenty–First Judicial District Court, Livingston Parish Louisiana; and No. 94 MDL 4000 United States District Court, Western District of Louisiana, Lafayette Opelousas Division.

30. Litigation and administrative costs were awarded in the amount of 6% to each category for a total cost of 12% on a settlement fund of approximately $135 million. Interest was added to distribution costs.

31. *Henry L. Johnson, et al v. Lincoln Creosote Company, Inc.*, et al, No. 70,481; Twenty–Sixth Judicial District Court, Bossier Parish, Louisiana.

32. Litigation and Administrative costs were assessed in a lump sum by the Court at approximately 9.6% of the $32 million gross settlement fund plus distribution costs of

| Pp. 43–44 | Collectively | Collectively | | |
|---|---|---|---|---|
| Ingram Barge [33]<br>Pp. 44–46 of Vol. I | 2.49% | 4.81% | 3.6% [34] | Not given |
| Sterlington Explosion [35]<br>Pp. 46–47 | 7% | 6%% | $100,000 [36] | Not given |

Mr. Daniel H. Clavier, Jr. was the second expert to testify. He testified that 80% of his time as an accountant is spent as a court-appointed disbursing agent or consultant related to class action litigations. Out of the 18 cases he has handled, he was lead partner in all but one of them. (Tr. Pp. 86–87.) Further, his firm is presently handling seven mass tort cases which are not included in this analysis. (Tr. P. 900.) Regarding the cases he has handled, he testified that the following percentages were actually awarded by the various courts, they were not the amounts assessed: (Tr. P. 121.)

| CASE NAME | LITIGATION COSTS | ADMINISTRATIVE COSTS | DISTRIBUTION | DURATION OF CASE |
|---|---|---|---|---|
| Ingram Barge [37]<br>Pp. 96–100 of Vol. I | 2.49% | 4.8% | 3.6% [38] | 1998 -End date not given |
| Combustion, Inc.[39]<br>P. 101 of Vol. I | 6% | 6% | $500,000 [40] | Not Given |
| Shell–Norco Explosion [41]<br>Pp. 102–103 of Vol. I | 2.94% | 2.94% | $244,341 [42] | Not Given |
| Sterlington Explosion [43] | 7% | 6% | $100,000 [44] | Not given |

$581,537 plus interest that accrued on the fund after February 1, 2000.

**33.** *In the Matter of the Complaint of Ingram Barge Company*, No. 97–226 "A" and *Tangy Washington, et al v. Donald E. Carlton*, et al, No. 98–341–A, USDC–MDLA.

**34.** All costs were on the settlement proceeds which were about $40.5 million.

**35.** *Dumas, et al v. Angus Chemical Company, et al*, No. 92–1707, Fourth Judicial District, Ouachita Parish, Louisiana.

**36.** Plus interest on the settlement recovery. Settlement recovery was $85 million. Expenses exceeded amount reserved.

**37.** *Ingram Barge Litigation, Tangy Washington, et al v. Donald E. Carlton, et al*, Civil Action No. 98–341, United States District Court, Middle District of Louisiana, 17,000 Claimants. Settlement amount $41,500,000.00.

**38.** Judge Parker ordered 7% interest to be paid on litigation & administrative costs, the actual sums expended from the date of expenditure to through the date paid. 7% rate was

determined to run from when the costs were submitted. (Tr. Pp. 96–99.)

**39.** *In Re: Combustion, Inc.*, Litigation, Civil Action No. 94MDL4000, United State District Court, Western District of Louisiana, 10,000 Claimants.

**40.** Distribution costs were to be supplemented by the interest earned on the fund. 12.39% was awarded in all of these categories. Settlement was $127,396,000.00.

**41.** *In Re: Shell Oil Refinery*, Civil Action No. 88–1935, United States District Court, Eastern District of Louisiana, 18,000 Claimants. Settlement amount approximately $170 million.

**42.** Distribution percentage of 1.4% was supplemented by interest earned on the reserve.

**43.** *Marzell Ike Dunas, et al v. Angus Chemical Company, et al*, Civil Action No. 92–1707, 4th Judicial District Court, parish of Ouachita, 1,350 Claimants. Settlement amount $85,800,000.00, plus.

**44.** Plus interest to be supplemented by interest on the fund.

P. 104 of Vol. I

| Occidental Litigation [45]<br>P. 104 of Vol. I | 2% | 5% | 4% [46] | Not given |
|---|---|---|---|---|
| New Orleans Tank Car [47]<br>Pp. 105 of Vol. I | 4% | 4% | Not given | Not given |

Mr. Clavier testified that the average overall award for costs in the three federal cases above was 9%. (Tr. Pp. 102 103.) The average overall award for costs in the three state cases above was 9.52% and the average of all three was 9.26%. (Tr. P. 106.) Based on his knowledge of these and the other cases he has worked on, 2.5% is a very low amount of costs and is reasonable. (Tr. P. 106.)

Mr. Easterly also testified that, based on his experience and what he knows about what it costs to prosecute litigation such as this, it is his opinion that a 2.5% assessment for common benefit costs in a case of this nature is not only fair and reasonable, it may well be a bargain. (Tr. P. 50.) In order to render this opinion, he reviewed some of the pleadings filed in this matter, he reviewed the report from P & N and its attached schedules, he had personal meetings with numerous attorneys involved in this matter, he reviewed the information in his files regarding the cases he has handled in the past, and reviewed reported cases. (Tr. Pp. 48–49.) The awards in the cases he is familiar with averaged about 10% in costs and the lowest he is familiar with had a combined total of 7% for litigation and administration costs. (Tr. Pp. 50–51.)

**RECOMMENDATION**

Based on the review of the expenses incurred, as set out in detail above, and the testimony of the witnesses as to the type of work performed, and the prior awards made in mass tort cases and the opinions of the experts testifying in this matter, it is the recommendation of the undersigned that the Court approve the 2.5% withheld as reasonable costs in this matter and for the benefit of the group.

**45.** *Gail M. Clement, et al v. Occidental Chemical Corporation*, Civil Action No. 42,624 E and All Consolidated Cases, 29th Judicial District Court, Parish of St. Charles, 9,900 Claimants.

**46.** Settlement was $12,500,000.

**47.** *In Re: New Orleans Tank Car Leakage Fire Litigation*, Civil Action No. 87–16374 and All Related Cases, Civil District Court, Parish of Orleans, 9,000 Claimants.